**UNITED STATES ex rel. LINDENAU et al.
v. WATKINS, District Director of
Immigration and Naturalization.**

District Court, S. D. New York.

Sept. 11, 1947.

David Kubble and George C. Dix, both of New York City, for petitioner.

John F. X. McGohey, U. S. Atty., and Harold J. Raby, Asst. U. S. Atty., both of New York City, for respondent.

HOLTZOFF, Justice, District Court of the United States for the District of Columbia, sitting by designation.

This is a writ of habeas corpus issued on the petition of Max Pateau to review an order of the Commissioner of Immigration and Naturalization, directing the petitioner's deportation pursuant to the pertinent provisions of the Immigration law, U.S.C.A. Title 8, §§ 154 and 156. The ground of the projected deportation is that at the time of his entry into the United States, the petitioner was an immigrant not in possession of a valid immigration visa or a proper passport, and was not exempted from this requirement.

The petitioner arrived in the United States at the Port of New Orleans, on September 15, 1946. He came by airplane from Guatemala. It appears that he was expelled from that country by the author-

ities and placed on an airplane bound for New Orleans against his will. The order of the Guatemalan Government directed his deportation from Guatemala to Germany, and requested all intermediate countries to permit his passage to that country. Upon his arrival at New Orleans, the petitioner was taken into custody by the Immigration authorities and, after a hearing before a Board of Special Inquiry, U.S.C.A. Title 8, § 153, an order was made by the Commissioner of Immigration and Naturalization, excluding the petitioner from the United States on the ground that he was not in possession of a valid immigration visa or passport and was not exempted from the presentation thereof. Presumably, under ordinary circumstances, the petitioner would then have been returned to the place whence he came. Apparently this course was not practicable, as the Government of Guatemala had expelled him and evidently was not willing to permit his return. For some unexplained reason the petitioner was then incarcerated in jail in New Orleans instead of being detained at an immigration station. After several months' confinement in that institution, he was transferred to the Immigration Detention Station at Ellis Island, New York. Deportation proceedings were instituted against him on December 6, 1946, by the issuance of a warrant based on the ground that the petitioner was brought to this country in violation of law, U.S.C.A. Title 8, § 154. After a hearing before an inspector, the Commissioner of Immigration and Naturalization ordered the petitioner's deportation to Guatemala if that country would accept him, otherwise to Germany. The Board of Immigration Appeals after reviewing the order of the Commissioner, ordered the petitioner's deportation to Germany and on April 9, 1947, a warrant to that effect was issued.

On the petitioner's application, a writ of habeas corpus was granted to review the decision of the Immigration authorities. At the hearing on the return to the writ, it was contended by the petitioner that he was not subject to the immigration laws, in view of the fact that he came to this country against his will and was brought here by compulsion. This contention was overruled. This court held that the deci-

sion of the Circuit Court of Appeals in United States ex rel. Bradley v. Watkins, 2 Cir., 163 F.2d 328, on which the petitioner relied, related solely to prisoners of war and did not apply to a person in his position. This court further held, however, that insofar as the deportation warrant directed the deportation of the petitioner to Germany, it was invalid on the ground that the petitioner was not subject to deportation to that country, but might be deported only to Guatemala. The Government now moves for reargument of that question.

The selection of the place to which an alien is to be deported is regulated by statute, U.S.C.A. Title 8, § 156, the pertinent provisions of which read as follows:

"The deportation of aliens provided for in this chapter shall, at the option of the Attorney General, be to the country whence they came or to the foreign port at which such aliens embarked for the United States. * * * or, if such aliens are held by the country from which they entered the United States not to be subjects or citizens of such country, and such country refuses to permit their reentry, or imposes any condition upon permitting reentry, *then to the country of which such aliens are subjects or citizens,* or to the country in which they resided prior to entering the country from which they entered the United States." (Emphasis is supplied)

It will be observed that deportation may be to the country of which the alien is a subject or citizen, if the country from which he entered the United States rejects him and refuses to permit his reentry. It was on the basis of this provision that the immigration authorities directed the petitioner's deportation to Germany, having first found as a fact that he was a citizen of Germany.

The problem for solution, therefore, is ultimately whether the petitioner is a citizen of Germany, or a citizen of Guatemala. If the former, he is properly deportable to Germany. If the latter, the order of the immigration authorities is invalid. Before considering this question, however, it seems appropriate to determine the principles of law governing the scope of review in this court.

At one time in habeas corpus proceedings brought to review the validity of a deportation order, the court was limited to considering the questions whether the immigration authorities acted within the provisions of the applicable statutes, whether they accorded to the alien a fair hearing, and whether their findings of fact were supported by any evidence. Apparently, if there was any evidence whatever to sustain the findings of fact, they were not subject to further review by the courts. United States ex rel. Vajtauer v. Com'r of Immigration, 273 U.S. 103, 106, 47 S.Ct. 302, 71 L.Ed. 560. The law has been changed, however, by the recent Administrative Procedure Act, Act of June 11, 1946; 60 Stat. 237 et seq., Title 5 U.S.C.A. § 1001 et seq.

That enactment provides that every agency action made reviewable by statute and every final agency action for which there is no other adequate remedy in any court, shall be subject to judicial review. Sec. 10(c). Any person suffering legal wrong because of any agency action or adversely affected or aggrieved thereby, is entitled to judicial review thereof Id. Sec. 10(a). The Act does not, however, change the forms of proceedings for judicial review previously existing. Section 10(b) provides as follows on this point:

"The form of proceeding for judicial review shall be any special statutory review proceeding relevant to the subject matter in any court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action (including actions for declaratory judgments or writs of prohibitory or mandatory injunction or *habeas corpus)* in any court of competent jurisdiction." (Emphasis supplied.)

In other words, the Administrative Procedure Act does not in any way modify the existing forms of proceedings to review final actions of administrative agencies, nor does it create any new remedies if an adequate remedy is in existence.

A different question, however, is presented in dealing with the scope of review as distinguished from the nature of the remedy. Section 10(e), which governs this matter, reads as follows:

"(e) Scope of review. So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall (A) compel agency action unlawfully withheld or unreasonably delayed; and (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; (5) *unsupported by substantial evidence* in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute; or (6) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error." (Emphasis supplied.)

The vital provision of the foregoing section, for the purposes of this proceeding, is found in Clause (5), which empowers the court to determine whether the findings of fact made by the administrative agency are supported by substantial evidence, and to set them aside if its conclusion is in the negative. The statute contains no exception to this provision. Consequently, in those cases in which the scope of judicial review had been restricted within narrower bounds, it was enlarged to that extent. In reviewing administrative findings, the court must always determine whether the findings are supported by substantial evidence. It is no longer sufficient, as has been true in some instances, that the findings be supported by some evidence. The result is that in a habeas corpus proceeding to review a deportation or exclusion order of the immigration authorities, it is not enough that there be some evidence

to sustain the findings of fact. They must be supported by substantial evidence. If the court reaches the conclusion that there is no substantial evidence to sustain the findings, they must be set aside.

It becomes necessary, therefore, to ascertain the meaning of the term "substantial evidence." The word "substantial" as used in that phrase is a word of serious import. A great deal of weight was attached to it by the Congress in enacting the Administrative Procedure Act. The reports of the Senate and House Committees on the Judiciary relating to this legislation clearly disclose and demonstrate the accuracy of these observations.

The report of the Senate Committee presented by Senator McCarran (S. Rept. No. 752, 79th Cong., 1st Sess.) states: " 'Substantial evidence' means evidence which on the whole record is clearly substantial, sufficient to support a finding or conclusion under section 7(c), and material to the issues."

The report of the House Committee submitted by Congressman Walter (H. Rept. No. 1980, 79th Cong. 2d Sess.) is even more explicit and emphatic. It contains the following statement on this point:

" 'Substantial evidence' means evidence which on the whole record is clearly substantial, plainly sufficient to support a finding or conclusion under the requirements of section 7(c), and material to the issues. It is exceedingly important. Difficulty has come about by the practice of agencies and courts to rely upon something less—suspicion, surmise, implications, or plainly incredible evidence. Although the agency must do so in the first instance under this bill it will be the duty of the courts to determine in the final analysis and in the exercise of their independent judgment whether on the whole of the proofs brought to their attention the evidence in a given instance is sufficiently substantial to support a finding, conclusion, or other agency action or inaction. In reviewing a case under this fifth category the court must base its judgment upon its own review of the entire record or so much thereof as may be cited by any party."

This view was graphically accentuated by a statement made on the floor of the House of Representatives by Congressman Walter in explaining the provisions of the bill (Cong. Rec., May 24, 1946):

"The term 'substantial evidence' as used in this bill means evidence which on the whole record as reviewed by the court and in the exercise of the independent judgment of the reviewing court is material to the issues, clearly substantial, and plainly sufficient to support a finding or conclusion affirmative or negative in form under the requirements of section 7(c) heretofore discussed. Under this section the function of the courts is not merely to search the record to see whether it is barren of any evidence, or lacking any vestige of reliable and probative evidence, or supports the agency act on by a scintilla or by mere hearsay, rumor, suspicion, speculation, and inference—Cf. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 230, 59 S.Ct. 206, 83 L.Ed. 126. Under this bill it will not be sufficient for the Court to find, as the late Chief Justice Stone pointed out within the year, merely that there is some 'tenuous support of evidence'—Bridges v. Wixon, 326 U.S. 135, 178, 65 S.Ct. 1443, 89 L.Ed 2103. Nor may the bill be construed as permitting courts to accept the judgments of agencies upon unbelievable or incredible evidence."

What constitutes substantial evidence has been frequently defined and explained by the courts. In Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 230, 59 S.Ct. 206, 217, 83 L.Ed. 126, Mr. Chief Justice Hughes stated:

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

\*  \*  \*  \*  \*  \*

"Mere uncorroborated hearsay or rumor does not constitute substantial evidence."

In National Labor Relations Board v. Columbian Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660, Mr. Justice Stone enunciated the following principles:

"Substantial evidence is more than a scintilla, and must do more than create a

suspicion of the existence of the fact to be established. * * * it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

In Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985, 989, Judge Parker discussed this matter as follows:

"The rule as to substantiality is not different, we think, from that to be applied in reviewing the refusal to direct a verdict at law, where the lack of substantial evidence is the test of the right to a directed verdict. In either case, substantial evidence is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences."

In National Labor Relations Board v. Union Pacific Stages, 9 Cir., 99 F.2d 153, 177, Judge Garrecht pronounced the following views:

" 'Substantial evidence' means more than a mere scintilla. It is of substantial and relevant consequence and excludes vague, uncertain, or irrelevant matter. It implies a quality of proof which induces conviction and makes an impression on reason. It means that the one weighing the evidence takes into consideration all the facts presented to him and all reasonable inferences, deductions and conclusions to be drawn therefrom and, considering them in their entirety and relation to each other, arrives at a fixed conviction."

In Gulf Refining Co. v. Mark C. Walker & Son Co., 6 Cir., 124 F.2d 420, 425, 426, Judges Simons stated that "to submit to a jury a choice of probabilities is but to permit them to conjecture or guess, and where the evidence presents no more than such choice, it is not substantial."

It has been aptly remarked that "the rule of substantial evidence is one of fundamental importance and is the dividing line between law and arbitrary power." National Labor Relations Board v. Thompson Products, 6 Cir., 97 F.2d 13, 15.

The following principles may be deduced from the foregoing authorities: Substantial evidence is evidence of such quality and weight as would be sufficient to justify a reasonable man in drawing the inference of fact which is sought to be sustained. It implies a quality of proof which induces conviction and which makes a definite impression on reason. It must be more than a scintilla of evidence, and more than suspicion or surmise. It must be more satisfying than hearsay or rumor. Mere rags and tatters of evidence are not sufficient. Some courts have gone as far as to say that evidence subject to either one of two inferences is not substantial. The test in determining what constitutes substantial evidence in an administrative proceeding is the same as that applied in trials by jury.

This doctrine is of the utmost importance. It must be borne in mind that administrative authority is frequently delegated to subordinates who act in the name of the head of the agency to which they are accredited. In this respect the administrative process is vastly different in its essential nature from the judicial process. This circumstance makes it indispensable that the decisions of administrative agencies, which frequently dispose of important personal and property rights, should be subject to the substantial evidence rule. For example, in the present instance, the liberty of a human being and his entire future are at stake. This is generally the case in proceedings under the immigration laws. For these reasons the requirement of substantial evidence should be rigidly enforced in such proceedings.

This brings us to a consideration of the question whether the finding that the petitioner is a citizen of Germany, and, therefore, subject to deportation to that country, is sustained by substantial evidence. A review of the record is requisite for that purpose.

It appears that Max Pateau, the petitioner, was born in Guatemala City, Guatemala, on August 4, 1902, of a German father and a French mother. He has lived most of his life in Guatemala with the exceptions mentioned hereafter. At the time of his

birth there was in effect a treaty between Germany and Guatemala, signed on September 20, 1887, and known as the Montufar-Von Bergen Treaty. This convention was not called to the court's attention at the original hearing of this proceeding, but is vital in the disposition of this matter. The treaty contains the following pertinent provisions (British and Foreign State Papers, Vol. 79, p. 741):

"X. (1) The two High Contracting Parties, being desirous to evade all difficulties that might arise on the question of nationality, agree that those shall be considered as Guatemalans in Germany and as Germans in Guatemala who, having transferred their residence from the one to the other country, have preserved the nationality of their native land in conformity with the laws thereof.

"(2) They agree, likewise, that *the legitimate children of a Guatemalan father born in Germany shall be considered Guatemalan and the legitimate children of a German born in Guatemala as Germans.* (Emphasis supplied.)

"(3) Nevertheless, these children on becoming of age, according to the laws of their country, shall prove that they have complied or are complying strictly with the laws relating to military service in their country, and these proofs shall be made by legalized documents through the Diplomatic Agents of their country, before the authority appointed by the Government for such purpose.

"Should they not fulfil this requirement within 12 months from the date they become of age, they may be considered as citizens of the country of their birth."

It follows from paragraph (2) of Article X of the Treaty, just quoted, that the petitioner, though born in Guatemala, was a subject of Germany at birth. We do not encounter, therefore, any question of dual nationality, which is at times confronted in the case of persons born in one country of parents who are citizens or subjects of another country. At times each country regards such a person as its citizen. He then has the privilege of electing one or the other upon attaining his majority. In this case the petitioner had a single nationality at birth, namely, German.

The petitioner received his elementary education in a German school in Guatemala City, and then was sent to Hamburg, Germany for his high school education, remaining in that country for several years. Apparently he later became connected with a firm, established by his father, which acted as an agency in Guatemala for a number of German manufacturers. He married a native of Guatemala and has had three children born and brought up in that country. He claims to be a citizen of Guatemala and says he considers himself to be one. He admits, however, that in 1935 he registered at the German Embassy in Guatemala and that on several occasions he obtained a German passport for the purpose of visiting Germany. He endeavored to explain the first of these actions by stating that he was an agent of various German firms and was in danger of losing their business if he did not register as a German citizen. He tried to explain his application for a German passport in 1936 by stating merely that he did so in order to make it possible for him to take a vacation trip to Germany for the purpose of seeing the Olympic Games. Obviously this explanation may be deemed neither satisfying nor imposing.

During World War II, the petitioner was one of a group of persons who were brought to the United States in custody from South and Central America on the ground that they were suspected of being Nazi sympathizers, and who were confined in internment camps in the United States. He was given the option of remaining in custody in the United States or going to Germany. He elected the latter course, explaining that he chose it because thereby he could be reunited with his family, who came to Germany to join him. He remained in Germany from August 1942 until July 1946, when he was able to secure a German passport from the Guatemalan Ambassador in London, who was also the head of the Guatemalan Relief Commission in Germany. With the aid of this passport, he departed from Germany with his family in July 1946, and reached Guatemala in September, 1946. While his wife and chil-

dren were permitted to enter and remain in Guatemala, he, on the other hand, was promptly arrested by the Guatemalan authorities. An order was thereupon issued expelling him and ordering his deportation to Germany. He was placed on an airplane bound for the United States, with $20 in his pocket, the Guatemalan Government paying his fare. As stated above, he reached New Orleans on September 15, 1946 and was immediately apprehended by the immigration authorities. The proceedings previously summarized thereupon followed.

The petitioner predicates his contention that he is a citizen of Guatemala upon his birth in that country. Such an inference would be justified were it not for the fact that it is negatived by the provisions of the Treaty between Guatemala and Germany. The petitioner further strongly relies on a certificate of Guatemalan citizenship issued to him in 1946 by the Guatemalan Ambassador to Great Britain, who was also serving as Chairman of the Guatemalan Relief Commission in Germany. Ordinarily, such a paper would be impressive and persuasive. The peculiar circumstances of this case, however, greatly detract from its weight. After receiving this certificate in Europe, the petitioner returned to Guatemala. The Government of that country refused to recognize him as a Guatemalan, apparently ignoring this document. Moreover, what seems even more important, the petitioner on prior occasions had been able to procure German passports as a German, just as in 1946, he obtained the certificate of Guatemalan citizenship from a diplomatic representative of Guatemala.

██ It is quite apparent that at different times the petitioner variously represented himself either as a subject or citizen of Germany, or as a citizen of Guatemala, as it best suited his needs and desires at the moment. No moral compunction or sense of loyalty evidently stood in his path. A person who on different occasions makes contradictory representations as to a vital matter and later asserts that one of them is accurate and that the others were erroneous, may hardly complain if he en-

counters incredulity and hesitancy to accept his selection of the statement claimed to be true. He who says that he dissembled on prior occasions, but subsequently professes to tell the truth, may be suspected of duplicity in connection with the later statement. The administrative tribunal, which has the advantage of seeing and hearing the witness, has the right to determine which of his several conflicting allegations should be credited. Credibility of witnesses is ordinarily to be determined by the triers of the facts—in this instance the administrative agency. Apparently, his earlier statements, rather than his later position, were deemed by the immigration authorities to be true.

██ In analyzing the evidence, we start with the postulate that by virtue of treaty provisions the petitioner was a German subject at birth. A status once established is presumed to continue until the contrary appears. The petitioner could have later become a citizen of Guatemala in one of two ways: first, he could have taken affirmative steps to be naturalized in Guatemala; second, if upon reaching military age he failed to comply with the requirements of the laws of Germany regarding compulsory military service, he would have automatically lost German nationality and acquired Guatemalan citizenship, by operation of Article X, paragraph (3) of the Treaty. As to the first of these possibilities, there appears to be no contention that the petitioner ever applied for naturalization in Guatemala. As to the second, the record is barren of any evidence bearing on the question whether the petitioner fulfilled his military duties under German law. The Government made no attempt to prove that he did so, while the petitioner made no endeavor to show the contrary. Since his original status as a German national is presumed to continue until the contrary appears, the burden of showing a shifting of nationality by failure to perform his military obligations, was on the petitioner. Moreover, in the nature of things he was in a better position to offer evidence on this aspect of the matter than the Government. The inference to be drawn from a failure to adduce evidence on a salient point depends in large part on

the apparent ability of the respective parties to produce it, if it is in existence. As was stated by Mr. Justice Brandeis in Bilokumsky v. Tod, 263 U.S. 149, 153, 154, 44 S.Ct. 45, 56, 68 L.Ed. 221: "Silence is often evidence of the most persuasive character." From the petitioner's silence on this subject, coupled with the fact that some years after he reached military age, his registration as a German national was accepted by the German legation in Guatemala, and the further fact that he was able to procure German passports, the administrative tribunal had the right to draw the legitimate inference that he had fulfilled all of the requirements exacted by Germany and that, therefore, he did not lose German nationality or gain Guatemalan citizenship.

In the light of the foregoing considerations, the conclusion is reached that the administrative finding of fact that the petitioner is a citizen of Germany, is sustained by substantial evidence. The immigration authorities, therefore, committed no error of law in directing his deportation to Germany.

In view of this conclusion, it becomes unnecessary to decide whether in a habeas corpus proceeding of this character, the court may grant a trial de novo and take additional evidence under the provisions of Clause 6 of Section 10(e) of the Administrative Procedure Act.[1]

■■■■ In reaching its determination the Court has disregarded and ignored one of the items of evidence presented by the Government at the administrative hearing, namely, a communication addressed by the Ministry of Foreign Affairs of Guatemala to the American Ambassador, and dated October 8, 1946. It is the view of this court that this document was not admissible in evidence for the following reasons: first, it is an ex parte communication between persons who are not parties to this proceeding and opportunity to cross-ex-

amine the writer was lacking; second, the damaging statements contained in this document concerning the petitioner do not purport to be made on the writer's personal knowledge; and third, these statements are general conclusions not supported by details or proof. It is well established that administrative tribunals are not required to apply the strict rules of the law of evidence that govern trials at common law. Nevertheless, the basic and essential rules of evidence, which affect fundamental rights and which form a part of the rudiments of a fair hearing, are as binding on administrative tribunals as they are on the courts.

Thus, in Interstate Commerce Comm. v. Louis. & Nash. R., 227 U.S. 88, 93, 33 S.Ct. 185, 187, 77 L.Ed. 431, the Court enunciated this doctrine in the following words:

"The Commission is an administrative body and, even where it acts in a quasi-judicial capacity, is not limited by the strict rules, as to the admissibility of evidence, which prevail in suits between private parties. Interstate Commerce Comm. v. Baird, 194 U.S. 25, 24 S.Ct. 563, 48 L.Ed. 860. But the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended."

This principle was recently reiterated and applied in Bridges v. Wixon, 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103, in which the Court quoted with approval the foregoing expressions from Interstate Commerce Comm. v. Louis. & Nash. R., supra.

■■■ While this court deems the above-mentioned document to have been erroneously admitted in evidence at the deportation hearing, nevertheless, since there is ample competent and relevant evidence to sustain the administrative finding, the error is not prejudicial. In this connec-

---

[1] This question may possibly arise in a proper case in the light of the line of decisions of the Supreme Court commencing with Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; and continuing in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Walker v. Johnston, 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830; Waley v. Johnston, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302, and other similar cases which held that in a habeas corpus proceeding the District Court may take evidence dehors the record.

tion it should be noted that Section 10(e) of the Administrative Procedure Act expressly requires the court to take due account of the rule of prejudicial error. The court understands this provision to mean that unless an error is deemed prejudicial, the action of the administrative agency should not be set aside merely because an error was committed by it.

The record of the original hearing before the Board of Special Inquiry, contains the following testimony on the part of the petitioner:

"Q. Do you now apply for admission to the United States? A. I very fervently apply to give me the chance, as they don't accept me in Guatemala. Even if I should stay in a camp here I could work to let me stay in the United States and not send me to Germany, because it is a hell from which we have come."

The court is not unmindful of the hardship and distress which would be caused to Pateau and his wife and children by uprooting him from the land of his birth, where he has spent most of his life and where he has prospered, taking him by force to another continent and turning him loose in a disordered, subjugated country. Knowledge that a similar fate has befallen millions of others as a result of the terrible war that was brought on by Germany and that has convulsed the world, will hardly mitigate his suffering or assuage the agony of his family. While the court does not close its eyes to these devastating consequences, it must, nevertheless, circumscribe its action within its proper ambit and confine its decision to the sphere within which the law permits the court to act. Determinations of executive policy and the exercise of administrative discretion are not subject to control or revision by the judicial branch of the Government. Power to ameliorate the petitioner's lot is not vested in this court, but is lodged with the Commissioner of Immigration and Naturalization and ultimately with the Attorney General.

Motion for reargument granted. Writ of habeas corpus dismissed, petition denied and petitioner remanded. Submit proposed findings, conclusions of law and order.