**UNITED STATES ex rel. CAMMARATA**
**v. MILLER et al.**
Civ. No. 45–297.

United States District Court
S. D. New York.
April 20, 1948.

Herbert Zelenko, of New York City, Anthony Calandra, of Newark, N. J., and Sidney Kansas, of New York City, for petitioner.

John F. X. McGohey, U. S. Atty., of New York City (Harold J. Raby, Asst. U. S. Atty., of New York City, of counsel), for respondents.

RYAN, District Judge.

This is a proceeding which we have accepted as a bill or petition filed on behalf of Frank Cammarata, seeking judicial review of a final order of deportation made by the Commissioner of Immigration and Naturalization (hereinafter called the "Service"), pursuant to the provisions of the Administrative Procedure Act of 1946, 5 U.S.C.A. § 1001 et seq., and hereinafter referred to as the "Act". With this pending, there has also been filed another petition (which we accept as an amendment to the original bill), to review a determination of the Commissioner refusing to allow the release of Cammarata under bond until the final determination and decision of this court on the first petition.

It is contended in opposition that this court is without jurisdiction to review the final order of deportation by proceedings instituted under the Act, and that petitioner's only remedy lies by writ of habeas corpus. It is argued that the provisions of the Act may not be applied to deportation proceedings because the statute provides that the decision of the Attorney General, (and, therefore, that of the Commissioner of Immigration and Naturalization as his duly delegated subordinate), "shall be final." § 19 of The Immigration Act of 1917, as amended, 8 U.S.C.A. § 155.

The pertinent portions of § 10 of the Act, 5 U.S.C.A. § 1009, are:

"Except so far as (1) statutes preclude judicial review * * *

"(a) Any person suffering legal wrong because of any agency action * * * shall be entitled to judicial review thereof.

* * * * * *

"(b) The form of proceeding for judicial review shall be any special statutory review proceeding * * * or, in the absence * * * thereof, any applicable form of legal action * * *.

* * * * * *

"(c) Every agency action made reviewable by statute and every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review. Any preliminary, procedural, or intermediate agency action or ruling not directly reviewable shall be subject to review upon the review of the final agency action. * * *"

It is further provided by § 10, § 1009 (e) (B) of the Act that the court upon

review shall "hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. * * *"

In United States ex rel. Lindenau v. Watkins, S.D.N.Y. Sept. 1947, 73 F.Supp. 216, it was held that the provisions of § 10 of the Act were applicable to judicial review of proceedings had by the Commissioner of Immigration and Naturalization directing deportation pursuant to the Immigration Law, 8 U.S.C.A. §§ 154, 156. Although the matter came before the court in that case on issues raised by writ of habeas corpus, and not as here by bill for review under the Act, it quite clearly appears that the district court was of the opinion that the provisions of the Act should be applied in both instances. In United States ex rel. Trinler v. Carusi, D.C.Pa., June 1947, 72 F.Supp. 193, judicial review was denied. There, the court held that § 10 of the Act "is inapplicable to the extent that judicial review is limited by statutes, and that, since the immigration statutes deny the right to judicial review except for the writ of habeas corpus, no other character of remedy is available under this section." (U. of Pa.L.Rev. Vol. 96, p. 269, 1947). And, concerning this holding the following observation was made: " * * * The court in applying its view of § 10 to the instant case, determined that in addition to the conclusive bar which the immigration statutes interpose, to allow judicial review of a character other than habeas corpus would unduly hamper the deportation process. These conclusions are open to question. There is serious doubt that the Immigration Act of 1917 restricts review to the extent that this court supposed. The cases cited to support its interpretation of that act say nothing about the extent to which the act limits review, and were decided on other grounds. In addition, the Senate Report on the Immigration Act of 1917 indicates quite clearly that Congress had no intent, specific or general, as to the manner in which judicial review of deportation proceedings could be obtained. In that report and in subsequent decisions under the immigration statutes, it is indicated that the scope of judicial inquiry into deportation proceedings was to be narrowly circumscribed, but there is nothing in the report or the decisions to indicate an intent to restrict the character of judicial remedy in which that limited scope of inquiry could be exercised. That habeas corpus has been the sole means of review is thus the result of a procedural technicality and is not attributable to legislative mandate." (U. of Pa.L.Rev., supra)

The Circuit Court of Appeals, Third Circuit, 166 F.2d 457, 461, reversed this holding of the District Court in United States ex rel. Trinler v. Carusi, supra, by decision rendered on February 16, 1948, the court stating:

" * * * The nub of the question seems to us to be whether these deportation proceedings are such as to fall within the first exception to Section 10 as a proceeding provided by a statute which 'preclude(s) judicial review'.

"Our conclusion is that the case does not fall within the exception. Therefore the judicial review provisions found in Section 10 of the Act are applicable. We are impressed by the fact that in spite of the basic statute's wording habeas corpus proceedings have always been available. Since they have been available the situation cannot be one where judicial review in the past has been precluded."

and, further " * * * What we are here deciding is that the Act did enlarge the rights of people against whom deportation orders have been issued and that they are now entitled to judicial review after the issuing of a deportation order. That being so, a document headed 'Petition for Review' is an appropriate enough form in which to ask for the relief."

We hold that the Act is applicable to the deportation proceedings here involved.

■ We now come to a consideration of the objection raised that this court is without power to release petitioner under bond pending determination of this bill for review.

We have determined that this court may entertain the bill for review under the provisions of the Act. Having done so, it seems to follow that as an incident to this power the court may do all acts necessary

to accomplish and grant equitable relief to the petitioner, while his petition is pending before it. Here, it appears that the one form of equitable relief which might well be granted is the temporary release of petitioner under bond. One of the decisions of the Service which petitioner seeks to review is the denial to him of temporary release under bond. The granting of the prayer covering this portion of his bill would in itself effect his release under bond.

 Still another objection to the jurisdiction of this court is made by respondents, in the following language: "The petition for review herein names, as respondents, the Attorney General of the United States, the Commissioner of Immigration, and W. Frank Watkins, the District Director of Immigration, incorrectly, described in the petition as the District Attorney. The petition seeks to review an order of deportation made by the Commissioner of Immigration on behalf of the Attorney General of the United States. Since neither the Commissioner of Immigration nor the Attorney General are residents of the Southern District of New York, there is no jurisdiction in this court over said respondents, and accordingly, they should be stricken as parties to this proceedings. If this is done, then the only remaining party is the District Director, of Immigration; and while the court has jurisdiction over the person of the District Director of Immigration, since the said District Director is not the individual who made the order of deportation, and is merely the governmental officer named to execute it, there is no jurisdiction over the subject matter of the action. For it is obvious that it is the action of the Attorney General and the Commissioner of Immigration, rather than that of the District Director of Immigration, which is sought to be reviewed in this proceeding."

This objection on jurisdictional grounds starts off with the proposition that the mere naming of the Commissioner of Immigration and the Attorney General, in this proceeding, does not confer jurisdiction over them, and, that since the Commissioner and the Attorney General are not inhabitants of this district, they are not actual parties to this proceeding. Transcontinental & Western Air v. Farley, 2 Cir., 71 F.2d 288; Butterworth v. Hill, 114 U.S. 128, 5 S.Ct. 796, 29 L.Ed. 119.

The petitioner is presently confined within this district, at Ellis Island. Habeas corpus would properly lie in this district. The Act was intended to enlarge and amplify the judicial power of review, not to restrict or limit it further. We hold it was the intention of the legislature to permit the filing of a petition or bill for review in any district in which habeas corpus proceedings might be properly brought.

 Objection is further predicated upon the proposition that the Commissioner and the Attorney General are indispensable parties. Gnerich v. Rutter, 265 U.S. 388, 44 S.Ct. 532, 68 L.Ed. 1068; Webster v. Fall, 266 U.S. 507, 45 S.Ct. 148, 69 L.Ed. 411. We hold that, at least for the purposes of the relief sought in the amendment to the bill for review and to the extent of the relief granted herein, neither the Commissioner nor the Attorney General is an indispensable party. Williams v. Fanning, 332 U.S. 490, 68 S.Ct. 188, reversing 9 Cir., 158 F.2d 95.

An examination of the records of the Immigration and Naturalization Service, which are now before the court, reveals the following:

Petitioner is 49 years of age, and a citizen of Italy. He first entered the United States in 1913 and was duly admitted for permanent residence. He was married in 1926 to a United States' citizen. There were three children born—all in the United States—two daughters now twenty and sixteen years old respectively and a son nine There is nothing on the record to show that petitioner is not now a dutiful husband and father, supporting and maintaining his family to the best of his ability.

But, in the days of his youth he was in conflict with the law and his early record has lived to haunt him throughout the years. The records of the Service contain a finding that "the alien's criminal record establishes that he is a recidivist and as such not entitled to discretionary relief." The court finds that there is neither factual

basis nor justification in the record for such a statement.

An affidavit submitted on behalf of the Service by way of answer to the supplemental bill for review recites that he (petitioner) "was described in 1931 by the District Director of Immigration in Detroit as 'one of the most desperate gunmen and underworld characters in the City of Detroit.'" In an attempt to substantiate this the following is added, "Since his original entry into the United States, petitioner has been a constant associate and companion of notorious criminals and has lived mainly by his wits and by the point of his ever-ready gun. This is indicated by his F.B.I. fingerprint record covering the years 1921-1946, inclusive; showing 28 arrests for crimes involving violence, thefts, narcotic violations and bail-jumping."

Such a condemnation should be predicated upon more substantial and concrete evidence than that appearing on the records here submitted, or on the "yellow sheet" or fingerprint record of petitioner, contained in the record. Concerning his arrests, the fingerprint sheet shows the following:

"1922, Detroit, Michigan, robbery armed, discharged;

1924, Rochester, N. Y., investigation, no disposition;

1925, St. Louis, Mo., carrying concealed weapons, no disposition;

1930, Watertown, N. Y., violation of National Motor Vehicle Act, no disposition;

1921, Detroit, Mich., disorderly person, discharged;

1923, Detroit, Mich., robbery, not armed, discharged;

1924, Detroit, Mich., disorderly person, no disposition;

1924, Detroit, Mich., disorderly person, discharged;

1924, Detroit, Mich., investigation, discharged;

1924, Detroit, Mich., robbery armed, forfeited bond;

1925, Detroit, Mich., violation drug act, turned over Dept. of Justice;

1925, Detroit, Mich., robbery armed, discharged;

1925, Detroit, Mich., violation Dyer Act, discharged;

1925, Detroit, Mich., robbery armed, discharged;

1925, Detroit, Mich., violation Dyer Act, no disposition;

1925, Detroit, Mich., robbery armed, discharged;

1925, Detroit, Mich., carrying offensive weapons, discharged;

1926, Detroit, Mich., robbery armed, discharged;

1927, Detroit, Mich., robbery armed, discharged;

1927, Detroit, Mich., disturbing the peace, $5 or 10 days."

"Wanted as Frank Cammarata, Police Dept., Detroit, Mich. for jumping bond; per information received Jan. 25, 1932."

Except for the offense of disorderly conduct (disturbing the peace) for which Cammarata was fined $5 or sentenced for 10 days in Detroit, Michigan, in 1927, each arrest listed above resulted in his discharge and none in a conviction. Under no rule of law may arrests be considered as evidence of guilt, nor can they justify a finding that petitioner during those years— twenty years ago and after—lived "by the point of his ever-ready gun."

However, Cammarata, in his younger days does not appear to have been angelic in character.—

On July 1, 1925, Cammarata, then 26 years old was arrested in Detroit for participating in a robbery, while armed. He was not put to trial until six years later. In February, 1931, he was found guilty of that charge in The Recorder's Court for the City of Detroit, and upon that conviction was sentenced to imprisonment for an indeterminate term of fifteen to thirty years. In the meantime, while this charge was pending and before trial, Cammarata had been convicted in Windsor, Canada, in October, 1927, of a violation of section 15 of the Canadian Criminal Code—in that he unlawfully was in the possession of an offensive weapon (a loaded revolver). Upon that conviction he had been sentenced to imprisonment for three years. It was after his release in Canada that he was tried in Detroit on the robbery charge of 1925. These are the only two crimes of which it appears Cammarata was ever convicted—Robbery committed in Detroit in

1925, and unlawful possession of a revolver in Canada in 1927. Since 1932, sixteen years ago, he has had no arrest.

It appears from the record of proceedings that in 1936, the Governor of Michigan commuted Cammarata's sentence to the time already served. He was then released from prison; he contends here that this commutation was granted upon a showing of newly-discovered evidence, submitted to the Governor, that he was not in Detroit at the time of the commission of the crime for which he had been convicted. But, the Service says his release was effected (on December 16, 1936), so that he could be deported. (The record does show that Cammarata did submit what purported to be a four-page "true confession of Jimmy Schoules," dated March 8, 1932, assuming all responsibility for the robbery and exonerating Cammarata). Be that as it may, Cammarata was deported to Italy. His wife and the two children, they then had, followed him to that country, lived there for six months and then returned to the United States. Neither his wife nor the children could reconcile themselves to residence outside of their native land. Cammarata, too, returned, but illegally. He came as a stowaway in the Fall of 1939. There is no evidence that since that time he has been outside of this country. Since his return to the United States, Cammarata, it appears from the record, has been gainfully employed and at the time of his arrest on the deportation warrant here involved owned and ran a fish store in Cleveland, Ohio, and lived with his family in his own house which he had purchased for $7,000 paying $4,000 in cash and giving a $3,000 mortgage on it.

The present deportation proceedings have been pending since 1946. Petitioner was released by the Service on a $10,000 bond on August 1, 1946. He remained at liberty with his family, under this bond, until notification for his surrender on the bond for deportation was given his bondsman on March 1, 1948. It appears that he journeyed from his home to Detroit, Michigan in an endeavour to secure a pardon for his 1931 conviction. While in that city, at the home of his wife's sister, he was arrested on March 8, 1948 and his bond was revoked. He has since been confined. It was determined in January 20, 1948, by the Board of Immigration Appeals that the conviction of 1927 in Canada was not one for a crime involving moral turpitude, and rightly so, for it was but "malum prohibitum." There remains then as the sole grounds for petitioner's deportation the Detroit conviction of 1931 and his illegal re-entry in 1939.

But, petitioner protests his innocence of this crime of 1925 in Detroit of which he stands convicted by judgment of the Recorder's Court in 1931. He is seeking the vindication which he says is rightly his. He has made application for a pardon and the Service records show that such application (No. 355—Department of Corrections) has in fact been made and is pending before the Michigan Board of Pardons and Parole and the Governor. The Service was officially notified on February 20, 1948 that an application has been made and that "the pardon application has been reopened so that he may review his application for a pardon."

A motion has also been made on Cammarata's behalf in the Recorder's Court for the City of Detroit for a new trial. Hearings on this motion have been set for April 21, 1948, at which time it is asserted by affidavits that Cammarata's presence in the Recorder's Court is not only desirable but necessary. To permit his attendance application has been made to the Service for his temporary release under bond and the application has been denied. Similar action was suggested by this court, but the suggestion was rejected by the Service. The Service has, however, offered to send Cammarata to Detroit under guard, if he (Cammarata) pays all necessary expenses of both the guard and him.

■ On all the facts here present we cannot help but conclude that the action of the Service in denying petitioner's application is arbitrary, capricious and unwarranted. Such denial is an abuse of discretion and should be corrected by judicial action.

Petitioner, and particularly his wife and two minor children, are entitled to exhaust every legal means to establish his innocence

of the one felony conviction, which resulted in his deportation in 1937; for, if this conviction is set aside it seems that subsequent deportation would not be warranted.

The proceedings are remanded to the Commissioner of Immigration and Naturalization with directions that they be reopened and that petitioner be released upon posting good and sufficient bond in the penal sum of $10,000 in the usual form for a period of thirty days, to enable him to appear in the Recorder's Court in Detroit, and also to prosecute his application for a pardon, and that the warrant of deportation be stayed for such period of thirty days.

The bill for review is granted to the extent indicated herein.