**UNITED STATES of America,**
Plaintiff,

v.

**CITY OF GLEN COVE, LONG ISLAND,
NEW YORK;** Andrew J. DiPaola, Marvin L. Sutton, David Quient, County of Nassau, "John Doe" and "Mary Roe," Defendants.

No. 70-C-1188.

United States District Court,
E. D. New York.

Jan. 7, 1971.

**150**

Edward R. Neaher, U. S. Atty., E.D.
N.Y., Brooklyn, N. Y., by James D. Por-
ter, Jr., Bruce F. Smith, Cyril Hyman,
Asst. U. S. Attys., and Bruno A. Ristau,
Chief, Foreign Litigation Unit, Dept.
of Justice, of counsel, for plaintiff.

Morrison, Paul & Beiley, New York
City, by Elkan Abramowitz, New York
City, of counsel, Jerrad Siegel, Deputy
County Atty., County of Nassau, Mine-
ola, N. Y., for defendants.

## MEMORANDUM OF DECISION

JUDD, District Judge.

In this action, tried to the court with-
out a jury, the United States seeks to
enjoin the defendants from assessing
any taxes against certain property own-
ed by the Union of Soviet Socialist Re-
publics (USSR) in the City of Glen Cove,
or proceeding with any tax sales of such
property, and to require that any tax
liens be discharged of record. In addition
to the City, the defendants include the
Mayor, Finance Commissioner and City
Attorney. The complaint is based on
the assertion that the property is exempt
from taxation under Article 21 of the
1968 Consular Convention between the
United States and the USSR. 14 U.S.T.
[4] 5108, TIAS 6503. No cause of ac-
tion was established against the County
of Nassau, and no summons was served
on "John Doe" or "Mary Roe."

The defense is based on questions of
jurisdiction, standing, and the suffi-
ciency of proof of the exempt use of the
property, plus an assertion that the tax
lien attached before the treaty became
effective. A counterclaim in defendants'
answer seeks a declaratory judgment
that the United States must compensate
the City of Glen Cove for its loss of
taxes.

### Facts

The property in question comprises a
37-acre parcel in the City of Glen Cove,
known as Killenworth, improved with
a 45-room house, and described in the
complaint as a residence of the Perma-
nent Representative of the USSR to the
United Nations (UN) and his deputies.
It is conceded that the property has been
owned by USSR since 1955.

Killenworth was on the tax rolls of the
City of Glen Cove from 1960 to 1966,
and the taxes assessed against it then
were ultimately paid by the USSR. In
1966, it was removed from the tax rolls
by voluntary action of the City of Glen
Cove, presumably in recognition of the
exemption granted under New York
Real Property Tax Law, McKinney's
Consol.Laws, c. 50–A, § 418. In 1968,
the new Commissioner of Assessment
and Taxation removed the exemption and
placed the property on the tax roll for
the 1969 city tax and the 1969–70 school
tax. He notified the USSR by letter
dated June 14, 1968 that the exempt stat-
us had been terminated, and testified
that no protest was received before the
statutory grievance day, June 18th.

The taxes not having been paid, the
city declared them delinquent on May 20,
1970 and scheduled a tax sale of Killen-
worth to be held on June 26, 1970. The
sale was postponed by voluntary action
until September 28, 1970, and has been
further deferred by a temporary re-
straining order entered with the consent
of the parties on September 23, 1970,
and continuing until the final determina-
tion of plaintiff's motion for a prelimi-
nary injunction.

The hearing on the preliminary in-
junction was consolidated with the trial
on the merits.

The tax roll was completed on May 21, 1968 and was open for public inspection for three weeks thereafter. There is no statutory obligation to notify a property owner of the assessment or a change in exempt status. The tax roll is certified by the Commissioner of Taxation and Assessment to the Commissioner of Finance within thirty days after the June 18th grievance day. The total value of taxable property on the tax roll is used in determining the real estate tax rate, after the budget has been adopted on or before October 10th of each year. The city taxes became due on December 1, 1968 and the school taxes on August 1, 1969, and became liens on those dates.

The only proof that the property was used as a residence of USSR diplomats consisted of three certificates from the United States Department of State. The first transmitted an official translation of a note from the Permanent Representative of the USSR to the UN handed to Ambassador Charles W. Yost, Chief of Mission of the United States to the UN, on June 5, 1970 in New York; this note asserted that the real property was used exclusively as a residence for the Permanent Representative of the USSR to the UN and his deputies, and requested the assistance of the United States Mission in putting an end to the claims of Glen Cove.

The second was a copy of a translation of a note from the Ministry of Foreign Affairs of the USSR to the American Embassy in Moscow dated July 21, 1970. This second note repeated that

said property is used as a residence of the Permanent Representative of the USSR to the UN and Deputies of the Permanent Representative with the rank of Ambassadors and Ministers of the Union of Soviet Socialist Republics.*

After referring to the agreement between the United Nations and the United States regarding the headquarters of the United Nations, Section 418 of the New York Real Property Tax Law, and Article 21 of the Consular Convention, the note concluded:

the Ministry insists that the U. S. Government take steps to put an end to the unfounded claims of the Glen Cove city authorities against the property of the USSR Mission to the UN.

The third note was a letter dated October 16, 1970 from U. Alexis Johnson, Under Secretary of State for Political Affairs, to Attorney General John N. Mitchell, to be inserted in the record in this case, and stating,

The Department of State accepts as true the diplomatic representations of the Government of the Union of Soviet Socialist Republics that the real property owned by it in the City of Glen Cove is used as a residence of its Permanent Representative to the United Nations and his deputies having the rank of Ambassador or Minister of the Union of Soviet Socialist Republics and has been so used during the period following the City's recognition of the property's tax exempt status in 1966.

The United States in this action relies only on the Consular Convention and not on the UN Headquarters Agreement or the New York Tax Law.

The Commissioner of Assessment and Taxation testified that his revocation of exemption was not based on any change in the use of the property.

The only other fact which need be set forth, because of its bearing on the counterclaim, is that the taxes in issue amount to over $15,000.

* The statement that the deputies have the rank of ambassador or minister is apparently made with reference to the wording of the immunity provision of the United Nations Headquarters Agreement of 1947 (Pub.L. 357—80th Congr., 61 Stat. 756, § 15) and the exemption provision of the New York statute cited. For purposes of the Consular Convention it is sufficient that the property be used as a residence by "personnel attached to the diplomatic and consular establishments."

### Treaty Provision

Article 21 of the Consular Convention of 1968, 14 U.S.T. [4] 5108, TIAS 6503, provides:

1. Immovable property, situated in the territory of the receiving state, of which the sending state or one or more persons acting in its behalf is the owner or lessee and which is used for diplomatic or consular purposes, including residences for personnel attached to the diplomatic and consular establishments, shall be exempt from taxation of any kind imposed by the receiving state or any of its states or local governments other than such as represent payments for specific services rendered.

The treaty took effect on July 13, 1968.

It is not disputed that the treaty is binding on the defendants as "the supreme Law of the Land" by virtue of Article VI of the United States Constitution.

### Discussion of Law

1. *Jurisdiction and Standing*

Jurisdiction is based on 28 U.S.C.A. § 1345, which gives district courts original jurisdiction of all civil actions commenced by the United States.

Defendants assert that Section 1345 does not apply because the United States lacks any pecuniary interest in the subject matter and therefore is not the real party in interest.

 It has been long established that the United States need have no pecuniary interest in order to have standing to sue. In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1894). In the exercise of its constitutional responsibility for the conduct of foreign affairs, the United States may sue to prevent state action which would violate a treaty obligation of the United States. United States v. Minnesota, 270 U.S. 181, 46 S. Ct. 298, 70 L.Ed. 539 (1926); Sanitary District v. United States, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 (1925).

The conduct of foreign relations would be hampered and embarrassed if the United States Government were powerless to require units of local government to comply with treaty obligations, and if a treaty could be enforced only by the foreign government making itself a party to litigation before state or federal courts.

Defendants assert a further bar to jurisdiction on the basis of 28 U.S.C.A. § 1341, which forbids injunctions against state taxes. Section 1341 provides that:

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

However, Section 1341 has been held to be no bar to jurisdiction of suits instituted by the United States. See United States v. Arlington County, 326 F.2d 929 (4th Cir. 1964); United States v. Bureau of Revenue, 291 F.2d 677 (10th Cir. 1961); United States v. Woodworth, 170 F.2d 1019 (2d Cir. 1948).

 The absence of any pecuniary interest of the United States does not make it subject to the bar of Section 1341 in this case. A suit to enjoin collection of a state tax from an individual member of the armed forces, as a violation of Section 514 of the Soldiers and Sailors Civil Relief Act of 1940, was sustained in the *Arlington County* case, where the court said (326 F.2d at 932–933):

The right of the federal government to bring suit to enforce its policies and programs even in the absence of immediate pecuniary interest has been upheld in numerous other fields of federal activity.

\* \* \* \* \* \*

Here we find that the interest of the national government in the proper implementation of its policies and programs involving the national defense is such as to vest in it the non-statutory right to maintain this action.

153

Similarly, in Department of Employment v. United States, 385 U.S. 355, 358–359, 87 S.Ct. 464, 467, 17 L.Ed.2d 414 (1966), the United States was permitted to sue in federal court to enjoin the enforcement of a Colorado statute taxing the American National Red Cross, which was held to be "so closely related to governmental activity as to become a tax-immune instrumentality."

█ The tax exemption might be recognized in New York courts if the USSR saw fit to invoke their aid. Republic of Argentina v. City of New York, 25 N.Y. 2d 252, 303 N.Y.S.2d 644, 250 N.E.2d 698 (1969). However, in dealing with the enforcement of a federal treaty and the protection of the honor of the United States in meeting its obligations, a federal court is not required to abstain from jurisdiction in favor of a state court. United States v. Livingston, 179 F.Supp. 9 (E.D.S.C.1959). This case is not like United States v. City of New York, 175 F.2d 75 (2d Cir. 1949), where the question of the validity of taxes assessed against property of a voluntary hospital arose in the context of an agreement by the United States to pay the hospital a fixed sum per year plus the taxes legally levied on the property. No issue of control over foreign affairs was involved in that case.

█ The national government has a vital interest in the conduct of foreign affairs and the fulfillment of treaty obligations. This case, therefore, falls within the judicial exception to Section 1341, and the court has jurisdiction.

### 2. Proof of Exempt Usage of the Property

The Department of State requested the United States Attorney General to place on record in this court that the State Department accepted the truth of USSR's representations concerning the use of Killenworth as a residence of its diplomatic officials accredited to the UN.

The practice of presenting a claim of sovereign immunity to the courts through the Executive Department was early recognized as a proper procedure. The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 118, 3 L.Ed. 287 (1812). When a foreign ambassador departed from this practice by seeking direct intervention in an American court, the Supreme Court suggested that foreign governments should instead present their claims through the Executive branch of the government. The Navemar, 303 U.S. 68, 74–75, 58 S.Ct. 432, 434–435, 82 L. Ed. 667 (1938); cf. Ex parte Muir, 254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383 (1921).

The case on which defendants mainly rely is one where executive approval of the communication was missing. United States ex rel. Lindenau v. Watkins, 73 F. Supp. 216, 224 (S.D.N.Y.1947), reversed on other grounds, sub nom. United States ex rel. Paeteau v. Watkins, 164 F. 2d 457 (2d Cir. 1947). The only document before the court there was a communication from the Ministry of Foreign Affairs of Guatemala to the American Ambassador to Guatemala, not authenticated by the State Department.

Indications that State Department acceptance of a foreign government's claims are conclusive on the issue of immunity can be found in The Navemar, supra, where the Supreme Court said (303 U.S. at 74, 58 S.Ct. at 434):

> If the claim is recognized and allowed by the Executive Branch of the government, it is then the duty of the courts to release the [foreign] vessel upon appropriate suggestion by the Attorney General of the United States, or other officer acting under his direction.

Similarly, in Ex parte Republic of Peru, 318 U.S. 578, 589, 63 S.Ct. 793, 800, 87 L.Ed. 1014 (1943), the court stated:

> The certification and the request that the vessel be declared immune must be accepted by the courts as a conclusive determination by the political arm of the Government that the continued retention of the vessel interferes with the proper conduct of our foreign relations.

A majority of the court treated a State Department acceptance of facts as evidence, but not conclusive of the issue, in Sullivan v. State of Sao Paulo, 122 F.2d 355, 357 (2d Cir. 1941). Judge Learned Hand, concurring in the result, would have accepted the State Department's representation as conclusive, stating (p. 361):

> Certainly, if the answer depends upon how far the suit will affect foreign relations, only our foreign office ought to decide it.

██ In a case involving a foreign government's treaty rights, the court should accept an official note from that government as at least prima facie evidence, when accompanied by a State Department certificate of the truth of the assertions in the note.

It is not necessary here to consider whether the State Department's acceptance of the fact that Killenworth was used as a residence by the USSR Ambassador to the UN is conclusive, for the defendants did not seek to offer any evidence to the contrary. Cross-examination of the Under Secretary of State would not be a useful way to disprove this fact. The City of Glen Cove, where the property lies, has a clear opportunity to observe the use made of the property, and show whether there was a non-exempt use. If the diplomatic immunity of the premises and the occupants interferes with the defendants' obtaining precise evidence of the actual usage, as may be the case, this merely emphasizes that any attempt to challenge the Department of State's certification would impair the federal government's conduct of foreign relations.

### 3. *Priority of Lien*

The Consular Treaty became effective before the City of Glen Cove adopted its budget for 1969 or fixed the tax rate. The testimony was that the city tax became a lien on December 1, 1968 and the school tax on June 1, 1969 (S.M. 135), even though the city asserts that some sort of inchoate lien attached before those dates.

██ None of the cases on which defendants rely would permit collecting a tax from immune property under such circumstances. In Prevost v. Greneaux, 60 U.S. (19 How.) 1, 15 L.Ed. 572 (1856), the question was whether a French heir could rely on an 1853 treaty to avoid paying an inheritance tax on property which had passed on the death of a Louisiana resident in 1848. In United States v. Alabama, 313 U.S. 274, 61 S.Ct. 1011, 85 L.Ed. 1327 (1941), the state statute imposed a lien for 1937 taxes as of October 1, 1936, and the tracts involved were not conveyed to the United States until October 1, 1936, December 10, 1936, and March 10, 1937. The court held that the United States was not entitled to any different position from that of other purchasers of lands in Alabama who take conveyances on and after the specified tax dates. Nevertheless, the court held that tax sales made without the United States consenting to be a party to the proceedings were void and should be set aside.

If the Glen Cove lien attached before July 13, 1968, it might be necessary to consider whether tax exemption was also granted by Section 418 of the New York Tax Law or by the United Nations Headquarters Agreement. But it is clear here that there was nothing more than an inchoate lien, at most, before the Consular Convention took effect.

██ Defendants assert that Killenworth's status was fixed as non-exempt on June 1st. Real Prop. Tax L. § 302. This data would be relevant if there had been a change of ownership after June 1st, but it does not purport to create any lien. The Glen Cove Charter specifies that taxes become liens "on the respective days when they become due." Sec. 9–3. In any event, a lien which is still inchoate will not prevail over a right created by federal law. New York v. Maclay, 288 U.S. 290, 53 S.Ct. 323, 77 L.Ed. 754 (1933). Much less should a foreign government be deprived of a treaty benefit by the claim that a municipal government within the federal structure has power to postpone the real-

ization of what the treaty promised. Treaties, after all, are part of the law of every state. Hauenstein v. Lynham, 100 U.S. 483, 490, 25 L.Ed. 628 (1879).

This is not a case where a municipality has been taken by surprise by an unexpected removal of property from its tax rolls. The Glen Cove officials deliberately terminated an exemption which had previously been recognized, without citing any change of circumstances or other reason to justify their action.

As for the proviso in Article 21 of the Consular Convention, it is clear that the taxes involved were for the general support of the city government and were not "payments for specific services rendered."

The plaintiff's right to enjoin the Glen Cove tax sales is therefore fully established.

### 4. *Defendants' Counterclaim*

Defendants present an ingenious argument, in asserting that the United States must compensate the city for a loss of taxing power over the Killenworth property.

■ The rule is clear, however, that property owned by the United States is not subject to local taxes. McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L. Ed. 579 (1819). New York exempts property owned by the United States, without attempting to exact any compensation for the exemption. Real Prop. Tax L. § 400.

■ The attempt to treat an exemption from local taxation as creating an obligation to compensate for the loss of local taxes flies in the face of this rule. Public Water Supply District No. 3 v. United States, 135 F.Supp. 887, 133 Ct. Cl. 348 (1955). As was said in the *Public Water Supply District* case (135 F. Supp. at 890):

> While it is true that ownership of tangible property is not always essential to the establishment of a taking under the Fifth Amendment, the interest must be more than a mere right to tax.

Neither federal acquisition of property nor federal creation of a tax exemption in exercise of constitutional powers can be conditioned on any duty to make compensation to affected states or municipalities.

■ Defendants' counterclaim in any event is improperly brought, since the United States is not subject to suit in district courts under the Tucker Act for amounts over $10,000 based on nontort grounds. 28 U.S.C. § 1346(a) (2). To attempt to create jurisdiction by asking for a declaratory judgment of pecuniary liability without a formal money judgment is plainly a subterfuge to escape the limits of the Tucker Act.

### *The County of Nassau*

It was conceded at the hearings that the County of Nassau has no responsibility for the acts of the other defendants, and would have no part in the conduct of any tax sales.

### *Conclusion*

The United States is entitled to an injunction as prayed in its complaint against the defendants who were served, other than the County of Nassau. The complaint should be dismissed as against the County of Nassau. The counterclaim should be dismissed on the merits.

Settle judgment on notice.