The SIOUX TRIBE OF INDIANS, et al.

v.

The UNITED STATES.

No. 4-55.

United States Court of Claims.

Nov. 7, 1956.

Ralph H. Case, Washington, D. C., for appellants.

Maurice H. Cooperman, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for appellee.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

**231**

LARAMORE, Judge.

This is an appeal by the Sioux Tribe of Indians from an order of the Indian Claims Commission Docket No. 74 dismissing appellant's petition alleging that it was unconscionably compensated by defendant for 7,345,157 acres of its permanent reservation, more commonly known as the Black Hills, taken from it by the appellee pursuant to the Act of February 28, 1877, 19 Stat. 254.[1] The claim is brought under section 2(3) and (5) of the Act of August 13, 1946, 60 Stat. 1049, 25 U.S.C.A. §§ 70a, 70, establishing an Indian Claims Commission and providing for the powers, duties, and functions thereof.

The facts of the case date back to September 17, 1851, at which time the Fort Laramie Treaty, 11 Stat. 749, was signed between the United States Government and the Sioux Tribe of Indians describing the territorial limits of the Sioux or Dahcotah Nation. As the result of subsequent gold discoveries and the resultant tide of white travelers across the Indian lands to reach the gold fields lying farther west, many conflicts between the whites and the Indians arose and resulted in the Powder River War following which the Treaty of April 29, 1868, 15 Stat. 635, was signed between the Sioux and the United States. This treaty was ratified February 16, 1869, and proclaimed on February 24, 1869, 15 Stat. 635, 647. The treaty, in addition to other land, set apart the above referred to 7,345,157 acres for the absolute and undisturbed use and occupation of the appellant Indians as their permanent reservation and further provided in article 2 that "the United States now solemnly agrees that no persons except those

---

[1]. In its original petition, appellant sought compensation for 25,858,594.95 acres of land which was included in the outer boundaries laid down by the treaty of September 17, 1851, 11 Stat. 749, exclusive of the area described as the Permanent Reservation of the Sioux Tribe of Indians by Article II of the treaty of April 29, 1868, 15 Stat. 635, and to which the Sioux had the absolute and exclusive right to the undisturbed use and occupation. Appellant also sought compensation for 40,578,123.25 acres of land outside of the boundary lines of the 1851 treaty but to which the Sioux were guaranteed the right to hunt.

On appeal the claim has been confined to the 7,345,157 acres of its permanent reservation taken by the Act of February 28, 1877, 19 Stat. 254.

herein designated and authorized so to do, and except such officers, agents, and employés of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article".

The treaty also set forth requirements for any future cession of land as follows:

"Article XII. No treaty for the cession of any portion or part of the reservation herein described which may be held in common shall be of any validity or force as against the said Indians, unless executed and signed by at least three fourths of all the adult male Indians, occupying or interested in the same; and no cession by the tribe shall be understood or construed in such manner as to deprive, without his consent, any individual member of the tribe of his rights to any tract of land selected by him, as provided in Article VI. of this treaty."

At the time of the signing of the treaty it was known both to the Indians and the defendant that there was gold in the land though it was not known to what extent.

In the early 1870's many white settlers began invading the Indian lands and the United States, living up to its treaty commitments with the Indians, expelled these white people by military force. When, as the result of the Custer expedition in 1874, it became more generally known that there was gold in the Black Hills in paying quantities, the Hills were invaded by large numbers of white settlers and prospectors.

It became apparent to the President of the United States that it was imperative to have this land ceded to the United States not only for the protection of both the whites and the Indians but for the good of the entire country as well. Subsequent efforts were made by Commissioners appointed by the President to acquire the property by purchase. The Commissioners, however, were unable to get the consent of 75 percent of the male adults of the tribe as required by the treaty of 1868. Between September 20 and October 27, 1876, however, they did manage to get the signatures of nearly all the chiefs and about 10 percent of the male adults on an agreement ceding the Black Hills area to the United States Government and providing for certain compensation to be paid the Indians. This agreement was subsequently presented to the Congress and passed into law on February 28, 1877, supra.

It is undeniable that the ceded land was rich in gold and timber and contained huge expanses of arable lands. It is equally undeniable that at this time of history the Sioux Indians were entirely dependent upon the United States Government for their livelihood and had very little or no initiative to support themselves. They were incapable as farmers and indicated no inclination to mine the gold in their land. They were primarily hunters. Their plight was such that if they did not obtain their Government subsistence for one season they would have been reduced to starvation.

The treaty of 1868 contemplated that the Indians, with the assistance agreed to be rendered by the Government, would soon become self-supporting on their reservation. By the treaty of that year the United States agreed to provide the Indians with farming equipment, to furnish educational facilities for not less than 20 years, and to furnish each Indian with certain necessities for 30 years. The Government also agreed to pay the sum of $10 to each Indian while he roamed and hunted and $20 to each Indian who engaged in farming. In addition to these provisions, the defendant agreed to provide subsistence for the Indians for four years, this amounting to a total of $5,295,761.91 for the 4-year period. This provision was completely discharged by the disbursement of $1,314,000 under the Act of February 14, 1873, 17 Stat. 437, 456. Nevertheless, Congress continued to appropriate on June 22,

1874, 18 Stat. 146, 167; March 3, 1875, 18 Stat. 420, 441; and April 6, 1876, 19 Stat. 28, large sums of money for the continued subsistence of the Sioux Indians totaling about $2,350,000. The continuing appropriations were felt to be necessary, though not obligatory on the United States, as the Sioux were not yet self-supporting, contrary to the expectations of the 1868 treaty that they would be well on their way in that direction after four years.

It must be kept in mind that all the while these unobligated appropriations and payments were being made, hostilities existed between the Indians and the whites and, concurrently, the United States Commissioners were attempting to get the Indians to cede by treaty the territory in question as well as other lands.

On August 15, 1876, 19 Stat. 176, 192, another appropriation was made by the Congress to the Sioux Tribe for $1,000,-000 but the act provided that none of it should be paid to the Indians while there existed hostilities between them and the white people. The appropriating act further provided that:

" * * * and hereafter there shall be no appropriation made for the subsistence of said Indians, unless they shall first agree to relinquish all right and claim to any country outside the boundaries of the permanent reservation established by the treaty of eighteen hundred and sixty-eight for said Indians; and also so much of their said permanent reservation as lies west of the one hundred and third meridian of longitude, and shall also grant right of way over said reservation to the country thus ceded for wagon or other roads, * * *."

The act went on to say:

"And provided also, That no further appropriation for said Sioux Indians for subsistence shall hereafter be made until some stipulation, agreement, or arrangement shall have been entered into by said In-dians with the President of the United States, which is calculated and designed to enable said Indians to become self-supporting: * * *."

Faced with this, the above referred to chiefs and 10 per cent of the male adults signed the agreement which resulted in the Act of February 28, 1877, supra. The act provided in article V for the consideration to be paid the Sioux for the ceded territory. Under this article the United States agreed to provide "all necessary aid to assist the said Indians in the work of civilization; to furnish to them schools and instruction in mechanical and agricultural arts, as provided for by the treaty of 1868." It also stipulated that the United States would supply each Indian with a designated amount of rations as subsistence until the Indians "are able to support themselves." These subsistence commitments continue to be paid to this day and it is estimated that it will be necessary to continue the payments for many years to come at the rate of many hundreds of thousands of dollars per year as the Sioux are still incapable of supporting themselves without Governmental aid. As further consideration for the land taken, the 1877 act added 917,000 acres of grazing lands to the permanent reservation.

The appellant contends that the United States is guilty of duress in securing the signatures of the Indians that signed the agreement which led to the 1877 act ceding the land in question. As examples of the alleged duress, appellant points (1) to the appropriation act of August 15, 1876, supra, cutting off all future subsistence payments until the terms of that act were met, and (2) to other evidence in the record tending to show reprehensible methods used by the treaty commissioners to get the Indians to sign, such as, getting them drunk and then presenting the documents to them for signature. It argues also that such actions on the part of the United States constitutes unfair and dishonorable dealings.

Secondly, appellant contends that the compensation received for the lands it was forced to cede was unconscionable.

The Government denies that it acted unfairly or dishonorably and urges that the taking of the land in question, even though accomplished contrary to the expressed provisions of the treaty of 1868, was in accordance with established legal principles and was the only thing that could have been done under the circumstances when the Government's duty to all the people, whites and Indians alike, is taken into consideration. It further denies that the withdrawal of subsistence payments until the Sioux ceased hostilities and ceded parts of their land as demanded by the Act of August 15, 1876, supra, was duress as the United States was no longer obligated to make the payments. The treaty of 1868 which initiated the subsistence obligations on the part of the Government provided for them to be made for only a 4-year period. The last required payment was made three years previous to the appropriation act of 1876. The Government, in denying duress and lack of fair and honorable dealings, points also to the fact that for over two years it attempted unsuccessfully to negotiate with the Indians for the purchase of their land or, if not this, for the purchase of a license to mine the lands, and the right to grow stock and cultivate the soil as a necessary incident to the mining operations.

The Government, in answer to appellant's allegation of unconscionable consideration, contends that not only was the consideration paid for the land not unconscionable but that based on projected land values in 1877 the Indians have been overpaid.[2] It points out that the United States still makes and will have to continue to make subsistence payments for many years to come.

On the question of unconscionable consideration, which is that consideration which is so much less than the actual value of the property sold that the disparity shocks the conscience, The Osage Nation of Indians v. United States, 1951, 97 F.Supp. 381, 119 Ct.Cl. 592, certiorari denied 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672, the appellant urges that the proper value of the lands was not the market value or sales value at the time of taking which amount they concede has already been paid them, but, rather, a sum representing all the royalties which could have been earned from leasing the right to extract minerals, in addition to payment for all the timber lands that are part of the land in question. The basis of this theory of compensation is that because of the alleged legal relationship of guardian and ward existing between the Sioux and the United States, the United States had no power to appropriate the ward's property even on payment of its sales value, but only the power to manage that property for the continuing benefit of the ward and pay over to the ward the proceeds realized by the guardian's best efforts. The appellant insists that since it was known to the defendant that gold and silver in paying quantities were in the lands, the Govern-

---

2. Appropriations made under Article V of the Act of February 28, 1877, for the "civilian of the Sioux" are, according to appellant's own figures, as follows:

From the date of the act to June 30, 1925 as per General Accounting Office report .......... $37,006,973.00

From July 1, 1925, to January 1, 1935, as per General Accounting Office report .......... 7,184,560.00

Estimate from January 1, 1935 to January 1, 1953, based on the average appropriation from July 1, 1925, to January 1, 1935 of $756,269.00. (No exact figures are available.) .. 12,856,573.00

Total appropriations .. $57,048,106.00

It must be kept in mind that these appropriations will probably continue to be made at the estimated rate of about $750,000 for many years to come. The Sioux have not yet reached a sufficient stage of civilization or self subsistence.

ment should have developed the lands and operated the mines for the benefit of the Indian tribes as a necessary corollary to its fiduciary position as guardian of its ward Indians. The argument is, in effect, that the guardian-ward relationship existing between the United States Government and the Sioux Indians is the same fiduciary relationship that exists between the guardian and ward in private law. This being so, the Government's action in forcing the Indians to cede to it their land was a violation of their fiduciary duty to their wards to manage its property to the benefit of the wards.

The Government disputes this method of determining the proper measure of compensation for the land taken, asserting that the proper measure is found by comparing the consideration provided for in the act requiring the cession to the market value of the property at the time of the involuntary cession.

The Indian Claims Commission decided (1) that the contention of the Government relating to compensation was correct; (2) that the consideration received by the plaintiff was not inadequate or unconscionable; and (3) that the Government made a strenuously sincere effort to reach a fair basis of cession of the gold and silver producing lands to the Government, pointing out that the Indians themselves could not subsist on the gold and silver in the hills, nor extract the minerals or develop commercial mines. The Commission therefore concluded that the Indians were treated fairly and honorably and that the consideration received for the ceded land was not inadequate or unconscionable. The Sioux Tribe of Indians, v. United States, 2 Ind.Cls.Comm. 646.

This court is in complete agreement with all the findings of fact and conclusions of law of the Commission and, therefore, denies appellants request for reversal.

■ The appellant's allegation of duress is of no avail under the circumstances of this case because regardless of the reprehensible methods that may have been used by the Commissioners in getting signatures on the 1877 agreement, it was not the agreement that caused the cession of land, but the subsequent act of Congress.[3] The agreement as submitted by the treaty commissioners was ineffectual since it did not meet the requirements of the 1868 treaty for the cession of land. The fact that reprehensible methods were used to get signatures on a document that was binding on no one does not constitute duress. The treaty commissioners' mission was a complete failure. Since their actions did not result in the cession of the land, they cannot be the basis for an allegation of duress.

■ While it had been the practice and policy of the United States Government during the many years of tension between the whites and the Indians to negotiate with them by treaty convention and to settle differences, if possible, by treaty, those treaties did not absolutely abrogate the right of the Government to regulate the Indians or, when necessary, to legislate contrary to or inconsistently with a treaty. The primary consideration must be the good of the country and the duty the Government owes to all its citizens, not only the obligation that arose as the result of a previous treaty with the Indians or the duty that was created in the United States by virtue of its superior bargain-

3. Prior to 1871, the United States dealt with the Indian tribes by treaty. The President had the authority to negotiate with them and make agreements which, if ratified by the Senate, were binding. After that date, pursuant to the Appropriation Act of March 3, 1871, 16 Stat. 544, 566, 25 U.S.C.A. § 71, further dealings with them by treaty were forbidden. Agreements continued to be made but they had to be ratified by both houses of Congress and are therefore, acts of Congress. Congress, nevertheless, could legislate without a previous agreement or without even attempting to secure one.

ing position in relation to a weak and defenseless people.

In Lone Wolf v. Hitchcock, 1903, 187 U.S. 553, 566, 23 S.Ct. 216, 221, 47 L.Ed. 299, the Court said:

"The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the *power* to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians. * * *"

■ Treaties with the Indians are no different than any other public laws and are subject to contrary legislation by the Congress when it is felt to be in the interest of the country. By the same token, treaties with foreign countries can be breached by legislation from the Congress if it is deemed to be in the best interests of the country.

The Court further said in Lone Wolf v. Hitchcock, supra, 187 U.S. at pages 565, 566, 23 S.Ct. at page 221:

"* * * Until the year 1871 the policy was pursued of dealing with the Indian tribes by means of treaties, and, of course, a moral obligation rested upon Congress to act in good faith in performing the stipulations entered into on its behalf. But, as with treaties made with foreign nations, [Chae Chan Ping v. U. S.] Chinese Exclusion Case, 130 U. S. 581, 600, 9 S.Ct. 623, 32 L.Ed. 1068, 1073, the legislative power might pass laws in conflict with treaties made with the Indians. [Citations omitted.]

The Supreme Court, in Choate v. Trapp, 1912, 224 U.S. 665, 671, 32 S.Ct. 565, 567, 56 L.Ed. 941, while speaking on this subject, stated as follows:

"* * * the plenary power of Congress over the Indian Tribes and tribal property cannot be limited by treaties so as to prevent repeal or amendment by a later statute. The Tribes have been regarded as dependent nations, and treaties with them have been looked upon not as contracts, but as public laws which could be abrogated at the will of the United States."

■ The state of the law being thus, the fact that the defendant did not secure the required 75 percent of the male adult signatures on the 1876 agreement with the Indians is immaterial. The Government was free to legislate in spite of this and, in fact could have legislated without even attempting to negotiate an agreement. The only standard the Government had to observe was that it be in the best interests of the country to enact such contrary legislation, and that the Indians be treated fairly by it in view of the fact that they had been made certain guarantees by the treaty that was about to be abrogated. Fair treatment would include payment by the United States of just compensation for the lands taken. This, of course, would be necessary whether the suit involved Indians or other citizens. As the Court stated in Missouri, Kansas & Texas Railway Company v. Roberts, 1894, 152 U.S. 114, 117, 14 S.Ct. 496, 38 L.Ed. 177 "* * * the United States will be governed by such considerations of justice as will control a Christian people in their treatment of an ignorant and dependent race * * *."

■ It may be further pointed out that it is a basic principle of Indian law that even when lands are granted to a tribe of Indians by treaty, the fee remains in the United States subject to the Indians right of occupation. While the Indians have a better title than they had before the treaty guaranteed the

land to them, it is not absolute. They cannot alienate the land without the permission of the Government of the United States.

"Though the lands of the Indians were reserved by treaty for their occupation, *the fee was always under the control of the government;* and when transferred, without reference to the possession of the lands, and without designation of any use of them requiring the delivery of their possession, the transfer was subject to their right of occupancy; and the manner, time, and conditions on which that right should be extinguished were matters for the determination of the government, and not for legal contestation in the courts between private parties. This doctrine is applicable, generally, to the rights of Indians to lands occupied by them under similar conditions. * * * *The right of the United States to dispose of the fee of land occupied by them, * * * has always been recognized by this court from the foundation of the government.*" Missouri, Kansas & Texas Ry. Co. v. Roberts, supra, 152 U.S. at pages 116 and 117, 14 S.Ct. at pages 497.

The aforementioned being the controlling principles of law, the court cannot sustain the allegation of duress and must declare that the Government's action in requiring the cession of the land was, at least, not improper though it is liable to the extent of paying the Indians just compensation for the lands acquired.

■ The appellant's reliance on its guardian-ward theory of determining the conscionableness of the consideration is not well founded. If the United States was in any legal sense the guardian of the Sioux with respect to the property in question, there might be some merit to appellant's argument. However, we do not find that the legal relationship of guardian and ward did exist between the United States and the Sioux. While it has often been said by this court and

the Supreme Court that the general relationship of the Government to the Indians of the United States is *similar* to that of a guardian and ward, it has never been held that such a general relationship amounts to a legal guardian-ward relationship in the absence of some specific language to that effect in a treaty, agreement, or act of Congress. In the absence of such specific language, the general relationship of the United States to the Indians has been that of a strong and powerful sovereign to a comparatively weak and defenseless people and because of that fact, the courts have likened the relationship to that of guardian and ward and held that doubts in treaties and agreements should be resolved in favor of the weak and defenseless party to such treaties and agreements. This issue of the existence of a legal guardian-ward relationship between the Indians and the United States absent a specific provision in a treaty or agreement spelling out such a relationship was before this court in the case of Gila River Pima-Maricopa Indian Community, v. United States, Ct.Cl., 140 F.Supp. 776, 780, which stated:

"Whether or not the legal relationship of guardian and ward exists between a particular Indian tribe and the United States depends, we think, upon the express provisions of the particular treaty, agreement, executive order, or statute under which the claim presented arises. It is true that the word 'fiduciary' and the expression 'guardian-ward relationship' have been used by the courts to describe generally the nature of the relationship existing between the Indians and the Government. However, in the absence of some language in a treaty, agreement or statute spelling out such a relationship, the courts seem to have meant merely that the relationship between the Indians and the Government is 'similar to' or 'resembles' such a legal relationship and that doubtful language in the treaty or statute under consideration should

be interpreted in favor of the weak and dependent Indians. Creek Nation v. United States, 318 U.S. 629, 642, 63 S.Ct. 784, 87 L.Ed. 1046."

A reference to the Treaty of Fort Laramie, supra, or the treaty of 1868, supra, upon which this claim is based, will show no provision whereby the United States assumes the status of guardian of the Sioux Tribe of Indians in relation to the land in question. Accordingly, appellant cannot properly base this claim for conscionable consideration on the amount it would have received had the Government been required to manage the appellant's property as a legal guardian for the benefit of its ward.

The appellant does not, and well it cannot, question the power of the Government to take the property in question upon the payment of just compensation. It asserts its guardian-ward argument only as a means of substantiating its theory of compensation on a royalty basis.

■■■ It is a long established rule that just compensation must be based on the value of the property as of the time of its acquisition by the Government, in this case February 28, 1877; United States v. Miller, 1943, 317 U.S. 369, 373–375, 63 S.Ct. 276, 87 L.Ed. 336. In determining just what the value of the land was at the time of acquisition many things must be taken into consideration including the minerals in the ground and the timber standing thereon. United States v. Shoshone Tribe, 1938, 304 U.S. 111, 116–118, 58 S.Ct. 794, 82 L.Ed. 1213. Not to be forgotten in establishing this valuation are the facilities available for extracting the minerals and the means of transportation available after they have been extracted. Therefore, mere knowledge that gold in paying quantities lay beneath the ground in a given tract of land does not make it valuable if it can be mined only at an exorbitant expense. Thus, the projected value of a piece of gold bearing land in 1877 would not be as great as it is in this present day of rapid transportation and modern mining methods. The appellant seems to agree with these considerations in valuing a piece of property as it conceded that if the property, for the purposes of this suit, is to be valued as of 1877 they have already been overpaid for the property.

■■■ Since the appellant admits that as a result of the treaty of 1868 and its provisions for payment for the land it has already been paid in excess of the 1877 value of the land in question, and since the proper method of compensating for property taken is to base it on land values at the time of the acquisition, the appellant's claim is without merit. The Sioux have been justly compensated for the land they were forced to cede to the United States.

On appeal the appellant asserts that the Commission's findings of fact numbered 19, 22, and 23 are in error. The court does not find any error as the findings are substantially supported by the evidence in the record.

Finding 19, relating to duress or undue influence in securing the signatures of the Indians on the agreement which formed the basis for the 1877 act, has been discussed earlier herein. Finding 23, to the effect that the Indians were paid conscionable consideration and dealt with fairly and honorably under all the circumstances in relation to the land in question, has also been discussed earlier herein. Finding 22 is to the effect that the evidence in the record failed to establish that the Government or subsequent private owners of the land in question profited in any way from the gold and silver mined from the land; that the evidence also failed to establish what expense was involved in the mining of gold and silver from the property in question or that a monetary consideration based on a guess as to the prospective value of the mineral deposits in the land would have been as safe a provision for the future subsistence of the Indians as the actual monetary consideration provided for the land in the 1877 act. While this finding may not have been necessary to support the Commission's decision, it is

true that the evidence in the record does not establish any of the facts stated, and that circumstance does bolster the Commission's conclusion that the Indians were fairly and honorably treated and that the consideration paid them for their land was not unconscionable in view of all the facts and circumstances.

Appellant also makes seven specifications of errors of law. The first two relate to the guardian-ward relationship which has already been disposed of above. The third and fourth are as follows:

"(3) It was error for the Commission to enter a dismissal of Plaintiffs' petition at a preliminary stage of the proceedings, when the entire matter was before the Commission on a pretrial basis, without proof but based on estimates of mineral and timber production.

"(4) It was error for the Commission to enter a decision dismissing the case without extending to the Plaintiffs' the right to establish, by testimony, the contentions of Plaintiffs."

The proceedings were not dismissed at the pretrial stage. The plaintiff's case had already been rested once and a motion to dismiss for failure of proof was made by defendant, but denied. Plaintiff offered no proof of the value of the land. It was plaintiff's contention that the question of liability should be determined first, and only after that was decided should proof of value be determined. Subsequent briefs by the plaintiff and defendant were permitted by the Commission. In its briefs, and orally before the Commission, plaintiff insisted on its theory of determining the proper compensation for the lands, it being based on a percentage of the value of minerals extracted since the date of acquisition by the United States. The Commission disagreed, and announced to the plaintiff that the correct method would be by proving the value of the land at the date of acquisition by the Government. The plaintiff did not indicate that it would attempt to prove what the value

was on that date and did not offer any evidence to that effect. The Commission then made its findings and conclusions denying the plaintiff recovery. If, as argued for in assignment of error number (4), the Commission had allowed the Plaintiff to establish its contentions by testimony respecting value based on later royalty payments, the result would have been nothing but a waste of time. Assuming without deciding that it was error for the Commission not to allow plaintiff to introduce evidence supporting its theory of value, it was harmless error and not prejudicial to the plaintiff's case. See United States ex rel. Lindenau v. Watkins, D.C., 73 F.Supp. 216; Midland Valley R. Co. v. Railway Express Agency, 10 Cir., 105 F.2d 201; Williams v. Great Southern Lumber Co., 277 U.S. 19, 48 S.Ct. 417, 72 L.Ed. 761.

The fifth specification of error of law complains that the Commission disregarded the plaintiff's pleas for relief under categories numbered (2), (3), (4), and (5) of section 2 of the Indian Claims Commission Act, supra. There is no merit in this specification. The Commission in its decision and findings specifically ruled on the conscionableness of the consideration, duress, and fair and honorable dealings, such being the substance of categories numbered (3) and (5). Category (2), we think, involves a claim already decided by this court, Sioux Tribe of Indians v. United States, 1943, 97 Ct.Cl. 613, certiorari denied 318 U.S. 789, 63 S.Ct. 992, 87 L.Ed. 1155, when this identical case was tried and decided before this court under a special jurisdictional act, 41 Stat. 738, authorizing the Court of Claims "to hear and determine all legal and equitable claims, if any, of said tribe against the United States, and to enter judgment thereon." The Court there held that the claimants had no legal right to any compensation other than that which was provided for by the Act of February 28, 1877, and stated that the only claim the Sioux Indians had, if they had one at all, was moral and until the court was given jurisdiction by the Congress to hear a

moral claim it could not act. The Commission has been given the jurisdiction to hear moral claims under categories numbered (3) and (5). The appellant in this case can bring suit only under those categories. It has done so and relief has been denied.

■ Category (4) does not give the appellant in this case a claim. That category was included to cover those situations where the United States had, after mutual agreement as to price, acquired Indian land by treaty of cession or otherwise but did not subsequently pay the price already agreed to by the Indians. It does not, as claimed by appellant, give jurisdiction in a situation where land that was taken from the claimant and was actually paid for but in an amount not agreed to by the claimant as is the situation in the case at hand. Payment of the consideration provided for in the act of cession in this case was never withheld from the Indians, in fact, payments are still being made and will continue to be made.

Specifications of error of law numbered 6 and 7 relate to conscionable consideration and duress and have already been disposed of in other parts of this opinion.

The decision of the Indian Claims Commission is affirmed.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.