NATIONAL INDIAN YOUTH COUN-
CIL et al., Plaintiffs,

v.

Louis R. BRUCE et al., Defendants.

No. NC 21-71.

United States District Court,
D. Utah, N. D.

Jan. 10, 1973.

Richard L. Young, Native American Legal Defense and Education Fund, Albuquerque, N. M., for plaintiffs.

Glen J. Mecham, H. Ralph Klemm, Asst. U. S. Attys., Salt Lake City, Utah, for defendants.

## OPINION AND ORDER

ALDON J. ANDERSON, District Judge.

The court earlier granted a motion to dismiss the original complaint in the above-entitled action. Recognizing that certain individual plaintiffs might properly state a claim grounded in the Civil Rights Acts, this court also granted plaintiffs leave to amend as to such individual claims. Plaintiffs filed an amended complaint and defendants again moved to dismiss.

The original complaint was dismissed for a variety of reasons, including plaintiffs' inability to escape the effects of the doctrine of sovereign immunity, failure to exhaust administrative remedies, and the failure to set forth the allegations of the complaint in statements which are "short and plain," as required by Rule 8(a)(2).[1] In response to the leave granted by the court plaintiffs filed a lengthy, narrative amended complaint constituting, for the most part, merely a restatement of the original complaint, fraught with the same errors and imprecision.

### I

The amended complaint sets forth seven causes of action. The first is little more than a reintroduction of the original first cause of action and seeks an order of this court directing defendants to close down the Intermountain Indian School at Brigham City, Utah, and transfer the secondary education programs now being conducted there for Navajo youth to a suitable facility located on the Navajo reservation. As a ground therefor plaintiffs claim that defendants have violated the terms of Article VI of the 1868 Treaty with the Na-

1. Fed.R.Civ.P. 8(a)(2). See Order Dismissing Plaintiff's Complaint, National Indian Youth Council v. Bruce, Civil No. 21-71 (D. Utah Mar. 13, 1972).

vajo Indians,[2] which provides for the education of Navajo children between the ages of six and sixteen. Plaintiffs have apparently reintroduced this cause of action as a means of moving the court for a rehearing of the issues presented therein.

After reconsideration the court concludes that the grounds stated for dismissal of this cause in the first instance apply with equal force in the present instance.

This is plainly a cause of action seeking a judgment that would " . . . expend itself on the public treasury or domain, or interfere with the public administration . . . or . . . restrain the Government from acting, or . . . compel it to act." [3] As such, it is a suit against the government and is barred by the doctrine of sovereign immunity unless 1) the government has expressly waived immunity by statute; or 2) plaintiffs allege facts which bring this case within one of the exceptions to sovereign immunity recognized by the Court in Larson v. Domestic & Foreign Corp.[4] According to *Larson*, the doctrine of sovereign immunity prevents unconsented suit against the government unless 1) the actions of government officials are beyond their statutory authority; or 2) although acting within the scope of their statutory authority, that authority, or said officials' exercise thereof, is constitutionally void.[5]

No claim of waiver of sovereign immunity is made in the instant case. Plaintiffs apparently attempt, instead, to avail themselves of the first exception above by claiming, in effect, that by violating the 1868 Treaty defendants have exceeded their statutory authority and thus are precluded from invoking the doctrine in their defense. But, in defining the limits of defendants' discretion the court concludes that more must be looked to than the Treaty alone. The courts will not ordinarily undertake to construe a treaty in a manner inconsistent with a subsequent federal statute.[6] Furthermore, it has been long established that the plenary power of Congress over Indian tribes cannot be limited by treaties so as to prevent repeal or amendment by later statute.[7] To paraphrase Mr. Justice Holmes: words in the 1868 Treaty establishing reservation schools " . . . were addressed only to the tribe, and rested for their fulfilment on the good faith of the United States,—a good faith that would not be broken by a change (held) by Congress to be for the welfare of the Indians." [8] Likewise, the interpretation given treaties by the Executive merits important consideration, as explained by the United States Supreme Court in Kolovrat v. Oregon: [9]

2. 15 Stat. 667 (1868).

3. Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). *See also* Larson v. Domestic and Foreign Corp., 337 U.S. 682, 704, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947).

4. 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

5. *Id.* at 701–702, 69 S.Ct. 1457.

6. Whitney v. Robertson, 124 U.S. 190, 8 S. Ct. 456, 31 L.Ed. 386 (1888). *See also* Baker v. Carr, 369 U.S. 186, 212, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

7. Nicodemus v. Washington Water Power Co., 264 F.2d 614, 617 (9th Cir. 1959). *See also* Choate v. Trapp, 224 U.S. 665, 671, 32 S.Ct. 565, 56 L.Ed. 941 (1912); Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903); Thomas v. Gay, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898); Sioux Tribe of Indians v. United States, 146 F.Supp. 229, 235–236 (Ct.Cl.1956). This rule is supported by the fact that until 1871 Congress dealt with the Indian tribes by treaty alone, whereas in 1871 Congress unilaterally changed its manner of dealing with the tribes from treaty to statute. Act of Mar. 3, 1871, ch. 120, § 1, Stat. 566 (codified at 25 U.S.C. § 71 [1964]). *See* Note, The Indian Bill of Rights and the Constitutional Status of Tribal Indians, 82 Harv.L. Rev. 1343, 1347 (1969).

8. Conley v. Ballinger, 216 U.S. 84, 91, 30 S. Ct. 224, 225, 54 L.Ed. 393 (1910). *See also* 2 Antieau, Modern Constitutional Law 405–25 (1969).

9. 366 U.S. 187, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961).

While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight.[10]

Plaintiffs themselves refer the court to federal statutes enacted subsequent to the 1868 Treaty which authorize and establish off-reservation schools,[11] regulate the enlistment of students to attend such schools[12] and prohibit the use of government appropriations for the education of Indian children in sectarian schools[13] off the reservation.[14] These statutes clearly evidence an intent on the part of Congress to provide off-reservation schooling for Indian youth under certain circumstances and clarify or alter the Treaty in that respect, depending upon one's point of view. (In the present context it is irrelevant whether the Treaty has been altered or clarified.) They are operational statutes and they serve to chart and delimit the discretion of the instant defendants in a more meaningful sense than does the Treaty alone. The present operation of Intermountain is plainly within the scope of defendants' lawful discretion as circumscribed by the composite intent of Congress gleaned from the terms of both the Treaty and said statutes. Naturally, the present operation of Intermountain is also a reflection of the meaning given to the Treaty by the Department of Interior, the department of government particularly charged with its enforcement, and that fact is worthy of considerable weight in this proceeding.

Even if the Treaty were the sole source of defendants' discretion, there would be no basis for a conclusion that defendants have exceeded their discretion. The terms of the Treaty, which require that teachers and schools be provided on the reservation for children between the ages of six and sixteen, do not state, or even necessarily imply, a prohibition against the establishment of additional off-reservation schools, especially schools primarily for children over the age of fifteen. The thrust of Article VI seems to have been simply to provide education for Indian youth, rather than to prescribe where and in what particular manner that education should be provided under the varying and unforeseeable circumstances of the century which has passed since its signing. Furthermore, the thrust of the Treaty as a whole appears to have been, first, to provide land for the Indians and, second, to provide inducements for them to remain on the land and become a settled, agrarian community, as opposed to a community of nomadic hunters. In this context education for Indian children may be construed as an added inducement to make this change. This thrust removes Article VI even further from the construction which plaintiffs seek to place upon it.

■■ This court will not presume to question the judgment and intentions of Congress in entering into the 1868 Treaty or subsequent statutes enacted on the same subject. Therefore, unless plaintiffs are prepared to demonstrate that defendants have exceeded the discretion or violated any duties outlined by the Treaty and the whole range of federal statutes which touch upon the Treaty, they may not sue under the first exception to the doctrine of sovereign immunity referred to by the Court in *Larson*. The allegations of the claim grounded in the Treaty do not point to

---

10. *Id.* at 194, 81 S.Ct. at 926. *See also* Factor v. Laubenheimer, 290 U.S. 276, 294–95 (1933) ; 2 Antieau, *supra* note 8 at 407–08.

11. Act of Mar. 17, 1949, ch. 22, 63 Stat. 14.

12. 25 U.S.C.A. § 286 (1963).

13. 25 U.S.C.A. § 278a (1963).

14. The interpretation of this provision as applying to off-reservation schools is plain-

tiffs' own. The statute itself says nothing with respect to the location of the schools to which it pertains. The context in which the statutory language occurs in plaintiffs' complaint compels the conclusion that plaintiffs interpret the statute to refer to off-reservation schools. The court is in agreement with this interpretation.

actions by the defendants which conflict with their valid authority, as defined by the Treaty and subsequent statutes providing for off-reservation schools. The most that might be claimed is that by operating off-reservation schools for Navajo Indians defendants are exercising their lawful discretion in a manner which conflicts with these plaintiffs' concept of how such discretion should be exercised. Such a claim is beyond the pale of this court.

> In no event . . . may the court direct the manner in which discretionary acts are to be performed nor may it direct or influence the exercise of discretion in making that decision.[15]

This court concludes, therefore, that the following language of the United States Supreme Court in Larson v. Domestic & Foreign Commerce Corp.[16] is dispositive of plaintiffs' contentions in regard to sovereign immunity:

> We hold that if the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign . . . .. [T]he action itself cannot be enjoined or directed, since it is also the action of the sovereign.[17]

As a result, the doctrine of sovereign immunity is a bar to suit and this court has no jurisdiction to hear plaintiffs' claim concerning the Treaty.

 Regardless of the applicability of sovereign immunity, plaintiffs' proper remedy on the first cause is administrative under regulations promulgated by the Department of the Interior [18] for appeal from the actions of officials of the Bureau of Indian Affairs which violate a claimed right secured by the United States Constitution or any federal statute or treaty. Plaintiffs attempt to circumvent the administrative process by pointing to a statement in defendants' Memorandum in Support of Motion to Dismiss to the effect that compliance with plaintiffs' demand that the Brigham City school be relocated is beyond defendants' authority or prerogative. Plaintiffs claim that this statement shows that administrative action would be futile or inadequate. That claim is without merit. Plaintiffs suggest no other evidence that they would not receive a fair and adequate hearing of the issues involved upon proper presentation of these claims to the appropriate administrative body or that there exists a threat of immediate, irreparable injury. The statement in defendants' brief, alone, does not amount to a sufficient showing of inadequacy. For this reason not only must the first cause fail, but each subsequent reallegation of defendants' statement as a means of avoiding the requirement to exhaust administrative remedies must also fail.[19]

Even if the statements in defendants' memorandum to which plaintiffs refer could be construed as a predetermination of the outcome of administrative action justifying circumvention of the administrative process, there is a further, overarching limitation on judicial action which may, in any event, render this court powerless to adjudicate plaintiffs' Treaty claim or any claim upon which removal of the school is sought. The administration of an Indian school system may be identified as a function

---

15. McQueary v. Laird, 449 F.2d 608 (10th Cir. 1971).

16. 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

17. *Id.* at 695, 69 S.Ct. at 1464.

18. 25 C.F.R. § 2.1 et seq. (1972) (*See esp.* § 2.2).

19. It should be noted here that the instant statement in defendants' memorandum is relied upon with respect to each of the plaintiffs' seven causes of action as evidence of the inadequacy of administrative relief. By its own terms, however, the statement applies only to the prayer to remove the school. The statement sheds no light whatsoever on the prospects for administrative relief based upon other claims contained in the last six causes of action upon which declaratory judgment, damages, or other injunctive relief is sought and provides no reason to circumvent the administrative process in connection with such other claims.

which evokes the constitutional doctrine of the separation of powers. It is in the end a subject bearing upon the status of the Indian tribes, a subject which has been committed to the power of Congress. It was early determined that tribal Indians retained their character as a distinct political community,[20] and state jurisdiction over this entity was preempted by Congress' exclusive authority based on its power to declare war,[21] to implement treaties,[22] to regulate the disposition of federal lands,[23] and to regulate commerce with the Indian tribes.[24] Used in this sense, "exclusive" has come to mean Congress' exclusive authority vis a vis the state governments. This authority has been interpreted as paramount and plenary power to control and manage the affairs of the Indian people.[25]

 Congress has also exclusive authority vis a vis the federal judiciary with respect to the *status* of Indians.[26] The status of Indians, therefore, has been considered a nonjusticiable political question.[27] As used by the United States Supreme Court in cases involving the status of Indians the term "status" appears to mean the nature and description of Indian polities in relation to the government of the United States and the governments of the several states.[28] It appears to the court that the manner in which education is provided for the Indians is encompassed within the meaning of the term "status" and that, therefore, the manner of providing education is a matter committed to the exclusive authority of Congress. By way of its exclusive constitutionally-derived power over the status of Indian tribes Congress has established a guardian-ward relationship between the federal government and the Indian tribes. In its role as creator of the wardship status of the Indians Congress has undertaken to provide education for them and has made the initial policy determination that at least some of the schools established for the Indians shall be located off the reservation and that consenting parents may cause their children to attend such schools. The establishment of off-reservation schools is an appropriate means by which the federal government protects its guardianship and is a considered program undertaken in discharge of the obligations of that guardianship. Such a program should not be impaired by interference from the judiciary. It appears, in other words, that the establishment of off-reservation Indian schools was an exercise by Congress of its exclusive power to deal with the status of Indian tribes. Therefore, insofar as individual Indians, or classes of Indians, might be permitted to invoke the power of this court to remove an off-reservation school to the reservation, the guardian-ward relationship between the United States and the Navajo Indians would tend to be extinguished or

---

20. Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 557, 559, 8 L.Ed. 483 (1832) (Marshall, C. J.).

21. U.S.Const. art. I, § 8, cl. 11.

22. U.S.Const. art. I, § 8, cl. 1.

23. U.S.Const. art. IV, § 3.

24. U.S.Const. art. I, § 8, cl. 3. *See also* Note, The Indian Bill of Rights and the Constitutional Status of Tribal Indians, *supra* note 7 at 1347.

25. *See, e. g.,* Colliflower v. Garland, 342 F.2d 369, 377–378 (9th Cir. 1965); Wolfe v. Phillips, 172 F.2d 481, 485 (10th Cir. 1949), cert. denied 336 U.S. 968, 69 S.Ct. 941, 93 L.Ed. 1119.

26. *See,* Baker v. Carr, 369 U.S. 186, 215–216, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); United States v. Sandoval, 231 U.S. 28, 45–46, 34 S.Ct. 1, 58 L.Ed. 107 (1913); Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903); United States v. Holliday, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1865).

27. *See* cases cited note 26 *supra*. In Lone Wolf v. Hitchcock, the Court stated the following, 187 U.S. at 565, 23 S.Ct. at 221:

Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government.

28. *See* cases cited note 26 *supra*.

abandoned [29] and this court would contravene a policy established by Congress on a subject committed to the exclusive authority of Congress by the Constitution of the United States and thus interfere with that authority in violation of the doctrine of the separation of powers. The fact that an order of this court removing the Intermountain School to the reservation would appear to involve the status of Indians and, therefore, the separation of powers leads this court to conclude that the Treaty claim presents a nonjusticiable political question and that even without the other forceful reasons which exist for refusing to remove the school to the reservation, the court should refuse to take such action.

That the issue of the proper location of this school is a political question is made more clear by an analysis of the issue in terms of the test announced in Baker v. Carr [30] for determining whether an issue is a nonjusticiable political question.

It is apparent * * that several formulations which vary slightly according to the settings in which questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.[31]

The Supreme Court stated in that case that unless one of the above formulations was inextricable from the case, there should not be a dismissal on the ground that a political question was present.

▮▮▮▮ It is this court's opinion that all of these formulations are inextricable from the case at bar. First, a textual commitment of the issue of the status of Indians is demonstrated by section 8 of article I of the Constitution, which commits to the Congress power over commerce with the Indian tribes, the war power and the power to implement treaties and section 3 of article IV, which commits to Congress the power to regulate the disposition of federal lands, which together form a composite power over intercourse with the Indian tribes which is paramount, plenary and exclusive. Second, this court has not been furnished by the plaintiffs with any judicially discoverable and manageable standards by which it may be determined whether or not the Intermountain School should be moved by order of the court. Plaintiffs' factual allegations bearing upon the quality of education at the school and the moral conduct of students there do not equip the court to render such a judgment or aid in any material degree in plaintiffs' effort to

---

29. In Board of County Commissioners v. Seber, 318 U.S. 705, 718, 63 S.Ct. 920, 87 L. Ed. 1094 (1943), the Court held that it rests with Congress to determine when the guardianship relation shall cease. In another case the Court said that ". . . it is for Congress to determine when and how that relationship of guardianship shall be abandoned. It is not within the power of the courts to overrule the judgment of Congress." In re Heff, 197 U.S. 488, 499, 25 S.Ct. 506, 508, 49 L.Ed. 848 (1905), overruled on other grounds, United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192 (1916).

30. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (holding that the issue of state legislative apportionment is justiciable).

31. Id. at 217, 82 S.Ct. at 710. See also Coleman v. Miller, 307 U.S. 433, 454–455, 59 S.Ct. 972, 83 L.Ed. 1385 (1939).

establish a case or controversy. Third, it is clear that the decision to establish off-reservation schooling for Indians is a policy decision which was made at least twenty years ago by the political arm of the government. Therefore, the decision by a court of law to transplant an off-reservation school would both require an initial policy determination of a kind clearly for nonjudicial discretion and an expression of lack of the respect due coordinate branches of government. Fourth, embarrassment from the stand repeatedly taken by the Executive would certainly ensue. The courts are not in the business of determining, for example, where federal schools are to be located, what classes should be taught, the appropriate nature and extent of student counseling services to be provided or how, in any other respect, school administrators exercise their lawful discretion. To do so would be to disparage and embarrass a coordinate branch of government. There are no questions presented in the amended first cause of action which rise to the level of a bona fide controversy as to whether some action, denominated "political" or otherwise, exceeds constitutional authority.[32]

For the reasons recited, plaintiffs' claim based on the Treaty of 1868 is dismissed with prejudice.

## II

Plaintiffs next assert that defendants have exceeded the authority of an act of Congress. The enactment in question provided for the transfer of the building which now houses the Intermountain School from the War Assets Administration, which had used the building as a hospital, to the Secretary of the Interior.[33] The Act stated, in addition, that the building was transferred

> "for use by the Bureau of Indian Affairs as a vocational school for Indian children and a center for housing and

training adult Indians for off-reservation employment and placement."

Plaintiffs' claim is apparently founded upon an allegation that the school is not being used as a vocational school but, instead, is being used as a normal high school.

First, insofar as the facts alleged in this cause of action may establish that education at Intermountain is inferior in some respects, the cause of action must fail as a precise repetition of the same allegations presented in the amended first cause of action for reasons stated above. Second, this was an act providing principally for the transfer of a building to the Secretary of the Interior for use as a school for Indians. It was not an act principally concerned with what was to be done with the school by its new proprietor. The allegation that Congress "obviously" did not intend that a normal high school be established at Intermountain grossly begs the question. It must clearly appear from the allegations of the complaint that the intentions of Congress have been exceeded by the defendants.[34] This court concludes that Congress intended to vest in the Secretary of the Interior wide latitude in administratively interpreting the accompanying, subordinate charge to use the building as a vocational school. That latitude would appear to encompass the decision to use the building as it is presently used. Third, plaintiffs do not allege facts which support their claim. They make no attempt in their allegations, for example, to define and distinguish high school and vocational school, which must be done if plaintiffs may hope to recover on a claim which is based upon an interpretation of the statute which excludes high schools from its coverage. Nor are there allegations which would support a conclusion that defendants are operating a normal high school. In the absence of

32. Baker v. Carr, *supra* note 30, 369 U.S. at 217, 82 S.Ct. 691.

33. Act of Mar. 17, 1949, ch. 22, 63 Stat. 14.

34. *Cf.* Aetna Insurance Co. v. Hyde, 275 U.S. 440, 447, 48 S.Ct. 174, 72 L.Ed. 357 (1928); 2A Moore's Federal Practice ¶ 8.13, at 1712 (2d ed. 1968).

such allegations, the court may conclude at this point in the litigation that even if the statute has present force, its terms do not preclude the establishment of a normal high school at Intermountain.

Finally, it is not clear what relief is sought. From the terms of certain of the allegations of the second cause of action it appears that plaintiffs wish to enjoin defendants only from operating anything but a vocational school. Such a result, of course, would conflict with the premise urged in support of the first cause of action; namely that off-reservation schools for Indian youth are undesirable. Moreover, plaintiffs' prayer for relief does not seek to enjoin defendants from operating anything but a vocational school at the Brigham City site. The prayer seeks, instead, outright transfer of the school from Brigham City to the reservation. This relief is supported by certain other allegations of the second cause which have to do with inferior education and immorality at Intermountain. There is a conflict, then, between the relief which the vocational school allegations point toward and the relief actually prayed for. The two types of relief are, in fact, philosophically incompatible.

■ It appears that plaintiffs' allegations concerning the 1949 Act are intended as a device to avoid the defense of sovereign immunity. However, there appears to be no legally cognizable relationship between this device and the allegations of the second cause with respect to which immunity must be avoided if plaintiffs are to succeed on this cause; that is, the allegations of inferior education and detrimental moral effect, which apparently are the allegations relied upon in support of the prayer to move the school. Rather than describing the intent of Congress in using the term "vocational school," alleging wherein the Intermountain School is not a vocational school, and seeking as relief an injunction against operation of the school as anything other than a vocational school, plaintiffs proceed to allege that Intermountain provides an inferior education and has a detrimental effect upon the morals of its students. Even if it could be proved that defendants have exceeded their authority under the statute by operating a normal high school at Intermountain, no relief is sought based directly thereon and the resultant exemption from sovereign immunity would in no wise benefit the allegations of inferior education and detrimental moral effect or the transfer of the school to the reservation, which is the relief sought on the basis of the latter allegations. The amended second cause of action must fail, therefore, because Congress did not purport to restrict use of the school within narrow limits which would preclude its present use; because plaintiffs have, therefore, failed to allege wherein defendants have exceeded their authority under the statute; and because adequate allegations in that regard would provide no legal support and have no legal relationship to the other claims of the second cause or to the relief which plaintiffs apparently seek by that cause.

### III

■ Plaintiffs next claim that defendants are funding the Intermountain School in violation of an act of Congress which provides as follows:

> Funds appropriated on or after March 30, 1968, to the Secretary of the Interior for the education of Indian children shall not be used for the education of Indian children in elementary and secondary education programs in sectarian schools . . . .[35]

In support of this claim plaintiffs allege the following:

> [D]efendants . . . discourage plaintiffs . . . from practicing either the traditional Navajo religion or the ceremonies of the Native American Church, while on the other hand

35. 25 U.S.C.A. § 278a (1963).

the defendants show favoritism toward the Christian religion by such obvious means as an official Christmas message . . . which . . . bore an illustration of a Navajo man and a Navajo woman . . . in a simulation of the Christian nativity scene . . . . [D]efendants . . . have further shown disrespect to traditional Navajo religious beliefs by failing to observe Navajo customs honoring the dead . . . .

However true these allegations may be, it is manifestly clear that they do not state a claim under the statute. It would not be possible, in the court's judgment, to introduce evidence within the framework of plaintiffs' allegations which would sustain a finding that defendants are operating a sectarian school. Although the alleged practices referred to by plaintiffs may relate to religion, they do not constitute an adequate allegation that Intermountain School is a sectarian school. It appears to the court that by "sectarian school" Congress meant a school sponsored or supported, at least in part, by a religious denomination, or what is also commonly termed a "parochial school." Plaintiffs' allegations are insufficient to state a claim that Intermountain is such a school. This cause of action must, therefore, be dismissed. As Judge Wisdom observed in Hoshman v. Esso Standard Oil Co.,[36] ". . . when the facts, alleged or assumed within the framework of the complaint, show that the claim is without merit there is no need to go to trial."[37]

█ Insofar as plaintiffs are aggrieved by school-sponsored religious or anti-religious practices, they have, of course, claims classically suited, initially, to administrative relief. Plaintiffs having failed to make the necessary strong showing that proper presentation of these claims before the appropriate administrative bodies would be an inadequate remedy or would not result in a fair hearing, said cause of action is dismissed with prejudice.

## IV

Plaintiffs make the further claim that defendants have contravened 25 U.S.C. § 286, part of which provides the following:

> [I]t shall be unlawful for any Indian agent or other employee of the Government to induce, or seek to induce, by withholding rations or by other improper means, the parents or next of kin of any Indian to consent to the removal of any Indian child beyond the limits of any reservation.

█ It is not clear whether this statute is criminal in nature. No penalty is attached. On the basis of a court decision in a case brought upon a precursor of the present statute, however, it appears that a civil claim may properly be grounded in that statute.[38]

█ The class which the named plaintiffs purport to represent allegedly consists of Indian young people between the age of 13 and 23 years of age. It appears that none of the named plaintiffs was, at the time this suit was filed, both a student at defendants' school and of the age of majority. It appears, therefore, that said minors have no standing to invoke § 286. They are the legal wards of their parents and subject to the compulsion of their parents to attend defendants' school. The statute speaks only to the manner in which parental consent is obtained for the placement of children at the school. If said consent has been obtained by improper means, it is the parents, rather than the children, who have a cause of action un-

---

36. 263 F.2d 499 (5th Cir. 1959).

37. *Id.* at 502.

38. In re Lelah-puc-ka-chee, 98 F. 429 (N.D.Iowa 1899). Petitioner in that case, an Indian girl, sought a writ of habeas corpus on the ground that she was unlawfully re-strained of her liberty by being compelled to remain at an off-reservation Indian training school in violation of the statute. Act of Mar. 2, 1895, ch. 188, Art. VIII, 28 Stat. 906. The court countenanced the action, but denied the writ.

der the statute. No parents are parties to this action. Minor plaintiffs may not complain to the courts of their parents' decision to consent to their enrollment at the school. Nor may they complain that their parents compel them to attend.

The same reasoning applies to an extent with respect to any plaintiffs who may have reached the age of majority or be otherwise emancipated from minority status. Such plaintiffs may not invoke the present provision. Only their parents or those standing in the same legal relation to them as their parents may do so. However, since any such plaintiffs may be deemed emancipated from parental control, they may not be enrolled and required to attend without their own consent. No claim is made in the present complaint alleging that defendants have compelled any such plaintiff to attend the school against his own will. The court holds, therefore, that neither the named plaintiffs, nor any members of the class they purport to represent, have standing to sue under the instant statute. This conclusion is fully borne out by the following language from the opinion of the court in *In re Lelah-puc-ka-chee*,[39] apparently the only case heretofore decided involving the instant statute or a prior form thereof:

> The conclusion reached upon the questions submitted to the court is that the respondents, as the agent and school superintendent at the Tama county reservation, cannot by force or compulsion take the Indian children from the reservation proper, and keep them at the Indian training school, without the consent of the parents, or those who may stand in that relation to them; that, if Lelah-puc-ka-chee has in fact been married to Ta-ta-pi-cha according to the recognized tribal custom and manner, that fact emancipates her from parental control, and, if she wishes to leave the school, she cannot be lawfully prevented from so doing, but if she, although married, wishes to continue in attendance at the school, she has the right so to do; that if she is not in fact married to Ta-ta-pi-cha, and her parents desire to have her remain in the school, she being less than 18 years of age, the respondents have the right to require her attandance, but, if her attendance can only be secured by compulsion, that compulsion must be exercised by the parents . . . .[40]

Beyond the problems referred to in the discussion above, the court believes that the grievances cited in plaintiffs' fourth cause of action are best suited to presentation in the administrative process for a factual inquiry. No showing having been made that plaintiffs' claims have been ruled on administratively or that administrative remedies are not available or would be inadequate and, furthermore, it appearing to the court that in the absence of standing there is no legal basis upon which plaintiffs may recover in their amended fourth cause of action, the court concludes that plaintiffs' amended fourth cause of action should be dismissed with prejudice.

## V

As a fifth cause of action in their amended complaint plaintiffs allege the violation of their First Amendment right to freedom of religion and freedom of speech by virtue of their being required to attend an off-reservation school. As a basis for this claim plaintiffs allege, for example, defendants' refusal to permit the use of peyote by Intermountain students in religious ceremonies and the dissemination by defendants of a Christmas card bearing an illustration of a Navajo man and woman holding an infant in alleged simulation of the Christian nativity scene. Although the allegations of this cause of action may entitle plaintiffs to administrative relief, it is the conclusion of this court that plaintiffs' constitutional challenge to the matters complained of is so

39. In re Lelah-puc-ka-chee, 98 F. 429 (N.D. Iowa 1899).

40. *Id.* at 436–437.

lacking in substance that it affords no substantial basis for a claim of federal jurisdiction under 28 U.S.C.A. § 1331(a), as a civil action which arises under the Constitution of the United States.[41] Plaintiffs' fifth cause of action should be dismissed.

## VI

Plaintiffs' amended sixth cause of action alleges a violation of Fifth Amendment rights. As the basis for said claim plaintiffs allege that they have been deprived of a property right in the nature of a secondary education which will enable them to "function normally in the dominant white society if plaintiffs should choose or be compelled to subsist in that society." Aside from whether a property right of sufficient consequence to warrant the protection of the Fifth Amendment has been defined by the vague terms of plaintiffs' complaint, plaintiffs have again failed to demonstrate, to any degree, wherein the action which they request this court to take, that is, removal of the school to the reservation, would remedy the wrongs alleged in this cause of action.

Furthermore, plaintiffs again allege that defendants have denied parents of Indian children the "liberty" to bring up their children and participate meaningfully in their education. Yet no parent is among the plaintiffs or the class they claim to represent.

Paragraph 65(c) of plaintiffs' complaint also contains wholly frivolous claims which have apparently been included for some emotional effect but which have no place in a pleading in a legal action.

The case of Bolling v. Sharpe,[42] referred to by plaintiffs in support of their sixth cause of action, is inapposite. *Bolling* was a school segregation case. In the present case plaintiffs complain of segregation at Intermountain, but argue for segregation on the reservation. In other words, plaintiffs do not seek desegregated schooling. In fact, the schooling provided at Intermountain, which is in the midst of the white community, would appear to be less segregated than the reservation schooling plaintiffs request. Plaintiffs' sixth cause of action is accordingly dismissed.

## VII

Finally, plaintiffs complain of certain policies and practices allegedly adhered to by the defendants in the operation of the Intermountain School. With the exception of certain additional factual allegations, this cause of action is a precise restatement of the third cause of action contained in the original complaint. The original third cause of action was dismissed without prejudice for failure to state allegations sufficient to allow relief. The court ruled that plaintiffs' allegations did not "identify the person damaged, the extent of such damage, nor the person responsible for the alleged damage."[43] Most of the amended allegations suffer from the same failings. Six principal defects can be identified, at least one of which defeats each of plaintiffs' claims set forth in the amended seventh cause of action.

The first deficiency is the one cited in the court's first order and referred to above. Paragraphs 75, 76, 77, 79, 80 and 81 suffer from this deficiency with respect to the claim of monetary damages. Each of these paragraphs fails to specify at least one of the following in that respect: the person damaged, the extent of damage, and the person responsible for the damage. Each said paragraph thus fails to state a damage claim upon which relief can be granted. Second, Paragraphs 75, 76, 77 and 81 also fail to allege specific instances of misconduct by the defendants and/or fail to relate the claims con-

---

41. *Cf.* Groundhog v. Keeler, 442 F.2d 674, 678 (10th Cir. 1971).

42. 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

43. National Indian Youth Council v. Bruce, Civil No. 21–71 (D.Utah, Mar. 13, 1972).

tained therein to persons who are members of the class purportedly represented by the named plaintiffs and are thus insufficient to state a claim of illegal policy upon which relief can be granted. As a third deficiency, all paragraphs, together with plaintiffs' affidavits and argument offered in support thereof, fail to make a prima facie showing of the coordinate elements of probable right and probable danger required for temporary or preliminary injunctive relief.[44] Each said paragraph thus fails to state a claim for injunctive relief upon which relief can be granted. A fourth deficiency is the failure to seek administrative relief with respect to allegedly unconstitutional policies adopted by defendants. Paragraphs 75, 76, 77, 78, 79, 80, 81, 82, 83 and 84 suffer from this deficiency. Each of the policies complained of in these paragraphs requires the kind of factual determination for which administrative relief has been designed. These policies, if they do exist, have been implemented in the exercise of administrative discretion and are first subject to objection and review within the Department of Interior. Plaintiffs have made no claim that their complaints have been registered with the Department according to established procedure or that doing so would not result in appropriate and adequate relief. Indeed, plaintiffs acknowledged at the hearing before this court on the instant motion that certain policies and practices complained of in the original complaint were not included in the amended complaint for the reason that administrative action had been taken since the filing of the original complaint to change and improve those policies and practices. In the absence of contrary indications this court must assume that upon proper administrative application the same result would obtain with respect to any meritorious claims contained in the amended seventh cause of action. The fifth deficiency is the failure of paragraphs 78, 79, 80, 83 and 84 to disclose wherein defendants' failure or refusal to act, as alleged in said paragraphs, consitutes any denial of rights guaranteed by the First, Fifth and Ninth Amendments of the Constitution of the United States or by the statutory provisions cited by plaintiffs in said paragraphs. Paragraph 80, for example, complains that defendants refused to arrange and pay for Intermountain students to travel to their homes for Christmas without identifying any legally enforceable duty or obligation which defendants violated by such refusal. Sixth, the statements setting forth the seventh cause of action fail to comply with Rule 8(a)(2), Fed. R.Civ.P. which requires that a statement of claim be "short" and "plain," and Rule 8(e)(1), which requires that each averment must be "simple, concise and direct."[45] The possibility remains that individual plaintiffs might still state a proper civil rights claim for damages or for injunctive relief which would facilitate jurisdiction in this court notwithstanding the deficiencies discussed above.

## ORDER

Plaintiffs' amended causes of action one through six are dismissed with prejudice. The claims set forth in paragraphs 75–84 of plaintiffs' amended complaint are dismissed without prejudice to the filing of a proper federal claim which is sufficient and not subject to the deficiencies discussed in the court's opinion.

---

44. *See* Crowther v. Seaborg, 415 F.2d 437 at 439 (10th Cir. 1969), where the court stated the following:

> In hearings upon motions for temporary or preliminary injunctive relief, the burden is upon the one requesting such relief to make a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought. The applicant has the additional burden of showing a right to the specific relief sought because of irreparable injury that will result if the injunction is not granted. There must exist a probable right and a probable danger.

*See also* 7 Moore's Federal Practice ¶ 65.-04[1] (2d ed. 1972).

45. 2A Moore's Federal Practice ¶ 8.13, at 1683–1712 (2d ed. 1968).